

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-1-2009

# Thomas v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 05-9008

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Thomas v. Horn" (2009). *2009 Decisions.* Paper 903.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/903

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 05-9006 & 05-9008

BRIAN THOMAS,

Appellant in No. 05-9006

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections; DONALD T. VAUGHN, Superintendent of
the State Correctional Institution at Graterford; JOSEPH P.
MAZURKIEWICZ, Superintendent of the State Correctional
Institution at Rockview; THE DISTRICT ATTORNEY OF
PHILADELPHIA COUNTY

Appellants in No. 05-9008

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court  No. 00-cv-803
District Judge: The Honorable Louis H. Pollak

Argued May 1, 2009

Before: MCKEE, SMITH, and STAPLETON, *Circuit Judges*

(Filed: July 1, 2009)

Maureen Kearney Rowley
Billy H. Nolas (Argued)
Victor Abreu
David Wycoff
Federal Community Defender Office for the Eastern District
of Pennsylvania
Suite 545 West—The Curtis Building
601 Walnut Street
Philadelphia, PA  19106
        *Attorneys for Brian Thomas*

David Curtis Glebe (Argued)
Thomas W. Dolgenos
Ronald Eisenberg
Arnold H. Gordon
Lynne Abraham
Robert M. Falin
Three South Penn Square
Philadelphia, PA 19107
        *Attorneys for Martin Horn, Donald Vaughn,*
        *Joseph Mazurkiewicz, and the District Attorney*
        *of Philadelphia County*

SMITH, *Circuit Judge.*

In 1986, Brian Thomas was convicted in the Court of Common Pleas of Philadelphia of murder in the first degree, burglary, involuntary deviate sexual intercourse, and rape. The jury sentenced him to death. Thomas was unsuccessful on direct appeal, *see Commonwealth v. Thomas*, 561 A.2d 699 (Pa. 1989) (hereinafter "*Thomas I*"), and in his state court petition for post-conviction relief, *see Commonwealth v. Thomas*, 744 A.2d 713 (Pa. 2000) (hereinafter "*Thomas II*"). Thomas then petitioned the District Court for habeas relief pursuant to 28 U.S.C. § 2254. *Thomas v. Beard*, 388 F. Supp. 2d 489 (E.D. Pa. 2005) (hereinafter "*Thomas III*"). The District Court granted Thomas sentencing relief based on his trial counsel's ineffectiveness, but denied his guilt-phase claims. *Id*. at 536. Both Thomas and the Commonwealth[1] appealed. For the reasons that follow, we will affirm the District Court's guilt-phase determinations, but will vacate the District Court's order for sentencing relief, and

---

[1]We refer to Martin Horn, Donald Vaughn, Joseph Mazurkiewicz, and the District Attorney of Philadelphia County collectively as the "Commonwealth."

remand for an evidentiary hearing concerning the extent, if any, of trial counsel's pre-sentencing investigative efforts to obtain mitigation evidence.

## I.

On August 9, 1985, one of Linda Johnson's roommates walked into their Philadelphia apartment and found Johnson's dead body lying face-down on a broken box-spring in her room. Johnson's eyes and face were swollen, and her nose and right temple were bleeding. She had a bite mark on her cheek and bruises on her arms and thighs. She was naked from the waist down, and blood was seeping from her vagina and rectum. A blood-encrusted crutch was found near her body. It was also determined that a television set and a can containing about twenty-nine dollars in change were missing from the apartment.

An autopsy of Johnson revealed that she had three fractured ribs and a twenty-three inch tear inside her body that reached from her vagina to her chest cavity. A shirt also had been inserted into her rectum, through her intestinal wall, and into her abdominal cavity with a blunt instrument while she was still alive. Additionally, sperm was found inside her vagina.

Three days after the discovery of Johnson's body, the Commonwealth arrested Thomas for her rape and murder, and for burglarizing her apartment. At trial, three witnesses testified that they had seen Thomas and Johnson together at or near her

4

apartment within hours of the discovery of her body. The Commonwealth also introduced medical evidence that: the sperm found in Johnson's vagina was deposited around the time that Thomas and Johnson were last seen together; the sperm was deposited by a non-secretor (one who does not secrete traces of blood in bodily emissions); Thomas was a non-secretor; blood found on Thomas' boxer shorts was human blood; and the bite mark on Johnson's cheek matched Thomas' teeth. Finally, the Commonwealth introduced evidence that Thomas was in possession of both the missing television and the twenty-nine dollars in change.

On February 6, 1986, the jury found Thomas guilty of murder in the first degree, rape, involuntary deviate sexual intercourse, and burglary. During the penalty phase, which began later that day, the Commonwealth offered evidence of three aggravating circumstances to support its request for the death penalty: 1) killing while perpetrating another felony, namely rape; 2) killing by means of torture; and 3) a significant history of violent felony convictions. *See* 42 Pa. Cons. Stat. § 9711(d)(6), (8), (9). The Commonwealth relied on trial evidence already presented to establish the first two aggravating circumstances. To establish the third, the Commonwealth offered evidence of Thomas' 1978 conviction for felonious aggravated assault and indecent assault on a three-year old, which caused injuries to the child's rectum and intestines, and Thomas' 1984 conviction for criminal trespass where Thomas unlawfully entered a neighbor's bedroom while she was

5

sleeping.

At the close of the Commonwealth's penalty-phase evidence, Thomas' court-appointed counsel informed the court that Thomas would not be presenting any mitigating evidence. The court determined that Thomas should be colloquied regarding the decision to present no mitigating evidence. After this colloquy, Thomas, through his counsel, declined the Commonwealth's offer to stipulate to his age and to the fact that he graduated from high school. As a result, Thomas presented no evidence of mitigating circumstances during the penalty phase. Nonetheless, in its penalty-phase charge to the jury, the court recited all the mitigating circumstances listed in Pennsylvania's sentencing statute for first-degree murder, 42 Pa. Cons. Stat. § 9711(e), and told the jury that "you may consider anything as a mitigating circumstance."

The jury found the three proposed aggravating circumstances and no mitigating circumstances. Accordingly, Thomas was sentenced to death on the first-degree murder conviction and to consecutive terms of imprisonment of up to fifty years for the burglary, rape, and involuntary deviate sexual intercourse convictions.

Thomas, represented by new court-appointed appellate counsel, unsuccessfully challenged his conviction and sentence on direct appeal to the Pennsylvania Supreme Court. *Thomas I*, 561 A.2d at 710. His subsequent petition for relief under

6

Pennsylvania's Post-Conviction Relief Act, 42 Pa. Cons. Stat. § 9541 *et. seq.* (hereinafter "PCRA"), was also denied. *Thomas II*, 744 A.2d at 717. Thomas then petitioned the District Court for habeas relief pursuant to 28 U.S.C. § 2254, raising twenty-three grounds for relief. *Thomas III*, 388 F. Supp. 2d at 495–96 & n.1. The District Court denied Thomas' petition as to his guilt-phase claims. *Id*. at 536. The District Court, however, determined that Thomas' trial counsel was ineffective at sentencing under *Strickland v. Washington*, 466 U.S. 668 (1984), because counsel failed to investigate and present mitigating evidence of Thomas' mental health. *Thomas III*, 388 F. Supp. 2d at 505–11. The District Court also determined that Thomas did not knowingly and intelligently waive his right to present mitigating evidence because the nature of the proceedings were not adequately explained to him, so the purported waiver could not cure the prejudice resulting from counsel's deficiencies. *Id*. at 513–16.[2] Accordingly, the District

[2]The District Court also determined that counsel's "incoherent" closing argument at sentencing exacerbated the prejudice caused by counsel's other deficient performances. *Thomas III*, 388 F. Supp. 2d at 511–513. Although we agree with the District Court that "counsel's closing was, at best, incoherent and, at worst, in the service of the prosecution's contention that the jury should select death rather than life imprisonment" and that "[c]ounsel wholly failed in his duty to present a closing argument helpful to Thomas," *id*. at 513, it does not appear that Thomas raised these claims in his habeas

7

Court vacated Thomas' death sentence. *Id*. at 536.[3]

Thomas filed a timely appeal, and the District Court issued a certificate of appealability for three of Thomas' claims. The Commonwealth filed a cross-appeal alleging that the District Court's decision to vacate Thomas' sentence was in error.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Since the District Court ruled on Thomas' habeas petition without an evidentiary hearing, our review of its decision is plenary. *See Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002). This means that we review the state courts' determinations under the same standard that the District Court was required to apply. *Id*.

petition, *see id*. at 495–96, 498. Therefore, we will not address counsel's closing argument in our review.

[3]In light of its decision to vacate Thomas' sentence on the basis of Thomas' *Strickland* claim, the District Court dismissed, without prejudice, two of Thomas' other claims: *per se* ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), and jury bias at sentencing. 388 F. Supp. 2d at 516, 528–30.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was 'contrary to' or involved an 'unreasonable application' of clearly established Supreme Court law, or if a decision was based on an 'unreasonable determination' of the facts in light of the evidence presented." *Fahy v. Horn*, 516 F.3d 169, 189 n.20 (3d Cir. 2008). But when "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). "In such an instance, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Id*. A state court's factual determinations, however, "are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence." *Id*.

III.

We will first address the three claims before us on Thomas' appeal: 1) the trial court's "reasonable doubt" instruction to the jury was unconstitutional; 2) the Commonwealth's closing argument at sentencing was unconstitutional, and Thomas' counsel was ineffective for not objecting to it; and 3) Thomas' counsel was ineffective for failing to life-qualify the jury.

9

A.

At the outset, the parties contest whether AEDPA deference pursuant to Section 2254(d) applies to Thomas' claims. Section 2254(d) "applies only to claims already 'adjudicated on the merits in State court proceedings.'" *Appel*, 250 F.3d at 210 (quoting 28 U.S.C. § 2254(d)). Here, the PCRA court ruled on the merits of two of Thomas' claims—his closing argument and life-qualification claims—but did not address the third—his objection to the reasonable doubt instruction. On appeal, the Pennsylvania Supreme Court dismissed all three claims as waived because they were not raised in Thomas' amended PCRA petition. *See Thomas II*, 744 A.2d at 715 n.4. The Commonwealth argues that the PCRA court's decision on the merits is an "adjudicat[ion] on the merits in State court proceedings," which renders Section 2254(d) applicable to two of Thomas' claims. Thomas, however, contends that the Pennsylvania Supreme Court's determination supercedes the PCRA court's decision for the purposes of determining whether AEDPA deference is due. Accordingly, we must decide whether a claim has been "adjudicated on the merits in State court proceedings" when a lower state court decided the claim on its merits, but the reviewing state court resolved the claim entirely on procedural grounds.

The Second Circuit has provided a textual analysis of "adjudicated on the merits" as used in Section 2254(d):

10

When Congress uses a term of art such as "adjudicated on the merits," we presume that it speaks consistently with the commonly understood meaning of this term. *See* [*Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)]. "Adjudicated on the merits" has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground. *See e.g.*, *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497. . . (2001) (noting one definition of an "on the merits" adjudication as "one that actually passes directly on the substance of a particular claim before the court") (internal quotation marks and alterations omitted). *See also, e.g.*, *Black's Law Dictionary* 42 (7th ed. 1999) (adjudication: "1. The legal process of resolving a dispute; the process of judicially deciding a case. 2. Judgment."; adjudicate: "1. To rule upon judicially. 2. Adjudge."); *Webster's Third New Int'l Dictionary* 27 (1993) (adjudicate: "to settle finally (the rights and duties of the parties to a court case) on the merits of issues raised; enter on the records of a court (a final judgment, order, or decree of sentence)").

*Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). In *Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004), *rev'd on other grounds sub nom. Rompilla v. Beard*, 545 U.S. 374 (2005), we

11

quoted with approval the Second Circuit's interpretation of "adjudicated on the merits." *Id*. at 247 (quoting *Sellan*, 261 F.3d at 311). Other courts of appeals have done so as well. *See Teti v. Bender*, 507 F.3d 50, 56–57 (1st Cir. 2007); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004); *see also Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005); *Schoenberger v. Russell*, 290 F.3d 831, 840 (6th Cir. 2002) (Keith, J., concurring).

We reiterate today our approval of the Second Circuit's interpretation of "adjudicated on the merits." For the purposes of Section 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court has made a decision that 1) finally resolves the claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or other, ground. *See Rompilla*, 355 F.3d at 247 (quoting *Sellan*, 261 F.3d at 311); *see also Lambert*, 393 F.3d at 969 ("[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits."); *Sellan*, 261 F.3d at 312 ("For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment.").

12

We agree with the Commonwealth that an "adjudication on the merits" can occur at any level of state court. Unlike other statutes that address federal review of state court decisions, the plain language of Section 2254(d) does not specify that the "adjudication on the merits" be from any particular state court. *Compare* 28 U.S.C. § 2254(d) *with* 28 U.S.C. § 1257(a) ("Final judgments or decrees *rendered by the highest court of a State in which a decision could be had*, may be reviewed by the Supreme Court by writ of certiorari . . . ." (emphasis added)). But to qualify as an "adjudication on the merits," the state court decision must finally resolve the claim. This means that the state court's resolution of the claim must have preclusive effect. *See Rompilla*, 355 F.3d at 247 (quoting *Sellan*, 261 F.3d at 311).

Applying this rule to the state court decisions here, we see no "adjudication on the merits." Here, the Pennsylvania Supreme Court decided Thomas' claims on purely procedural, not substantive, grounds. This decision stripped the PCRA court's substantive determination of Thomas' claims of preclusive effect. *See* Restatement (Second) of Judgments § 27 cmt. o (1982) ("If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result . . . [and] [i]f the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination."); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal*

13

*Practice and Procedure* § 4432 (2d ed. 2002) ("If the appellate court terminates the case by final rulings as to some matters only, preclusion is limited to the matters actually resolved by the appellate court . . . ."); *see also, e.g.*, *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 327–28 (4th Cir. 2005) (holding that, although the trial court reversed an administrative determination on, *inter alia*, Constitutional grounds, res judicata did not apply to the Constitutional claims because the appellate court affirmed the trial court's decision without reaching the Constitutional issues). The Pennsylvania Supreme Court's procedure-based decision remains as the only resolution of Thomas' claims with preclusive effect. Accordingly, there has been no "adjudication on the merits," and AEDPA deference is not due. *See also Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (noting that Section 2254(d) did not apply to claims decided on the merits in state trial court, but disposed of on procedural grounds in the state court of appeals because "the disposition of the last state court to issue an opinion determines whether the state has invoked a ground of forfeiture" (citing *Ylst v. Nunnemaker*, 501 U.S. 797 (1991))).

The Commonwealth argues that the result we reach today is contrary to our decision in *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007). It is not. In *Nara*, the lower state court decided the merits of the petitioner's incompetency claim and the appellate court subsequently reversed this decision on procedural grounds. *Id*. at 191–92. Nonetheless, we remarked that the lower state court "plainly *did* reach the merits of Nara's incompetency claim

14

. . . ." *Id*. at 201. This statement, however, was not directed at any Section 2254(d) analysis; it was made in the context of determining whether the District Court correctly accorded a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1) to the factual determinations of the lower state court. *Id*. at 200. As we pointed out, "the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d)." *Id*. at 200–01. As a result, the *Nara* panel made no ruling on whether the lower court's decision on the merits was an "adjudication on the merits" for the purposes of Section 2254(d). Indeed, we described the lower court as having "reach[ed]," rather than adjudicated, the merits of Nara's claim.

*Fahy v. Horn* is also consistent with our decision in this case. In *Fahy*, we applied AEDPA deference to a lower court's decision on the merits even though a state appellate court dismissed the petitioner's subsequent appeal as waived. 516 F.3d at 197, 199, 202–03. The unique facts of that case, however, warranted such a disposition. In *Fahy*, while his appeal of the lower court's decision on the merits was pending, the petitioner filed a motion to "withdraw his appeal and to waive all collateral proceedings so that his death sentence could be carried out." *Id*. at 177. The appellate court remanded the appeal to the lower court "for a colloquy to determine whether petitioner fully understands the consequences of his request to withdraw his appeal and to waive all collateral proceedings." *Id*. After conducting the colloquy, the lower court determined

15

that the petitioner's withdrawal and waiver decisions were made knowingly and voluntarily, and the petitioner appealed. *Id.* at 178; *see also Commonwealth v. Fahy*, 700 A.2d 1256, 1258–59 (Pa. 1997). The appellate court affirmed the validity of the petitioner's withdrawal and waiver, and dismissed the appeal. 516 F.3d at 178; 700 A.2d at 1259–60.

On federal habeas review, we acknowledged that "the state supreme court never reached the merits of [petitioner's] petition because of his waiver, [but] we believe that deference still applies to the [lower state] court's decision." 516 F.3d at 203 n.36. We arrived at that conclusion because after the appellate court affirmed the validity of the petitioner's withdrawal and waiver, the lower court's decision on the merits was the decision that finally resolved the claims. *See Angel v. Bullington*, 330 U.S. 183, 189 (1947) ("If a litigant chooses not to continue to assert his rights after an intermediate tribunal has decided against him, he has concluded his litigation as effectively as though he had proceeded through the highest tribunal available to him."). Therefore, the lower court's decision was an "adjudication on the merits" that warranted AEDPA deference.

In sum, for the purposes of Section 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. Here, neither the Pennsylvania Supreme Court nor the

16

PCRA court "adjudicated on the merits" the three claims before us on Thomas' appeal. Accordingly, we will review purely legal questions and mixed questions of law and fact *de novo*, but presume the correctness of any factual conclusions made by the state courts. *See Appel*, 250 F.3d at 210.

B.

Having decided the appropriate standard of review, we will move to the merits of the claims at issue in Thomas' appeal.[4]

---

[4]Notwithstanding the Pennsylvania Supreme Court's decision to dismiss them on procedural grounds, Thomas has exhausted all three claims before us on his appeal. *See Holland v. Horn*, 519 F.3d 107, 112 (3d Cir. 2008) ("[A] petitioner will have exhausted his state remedies even if the state court does not address his federal claims on the merits but, instead, rejects the claims on an independent and adequate state ground.").

Additionally, there is no procedural bar on federal habeas review. Since Thomas filed his PCRA petition before the Pennsylvania Supreme Court abandoned its "relaxed waiver" doctrine for capital cases in *Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998), the Pennsylvania Supreme Court's dismissal of Thomas' claims as waived "is not adequate to support the judgment for the purpose of finding a procedural default under federal habeas law." *Jacobs v. Horn*, 395 F.3d 92, 117–18 (3d Cir. 2005). The Commonwealth does not contest this point, but does preserve it for potential en banc or

17

1.

Thomas' first claim is that the trial court's instruction on the definition of reasonable doubt violated due process because it suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. Here, the trial court instructed the jury that a reasonable doubt is "such a doubt as would cause a reasonable person to restrain from acting in a matter of great importance in his or her own life." Thomas argues that the words "restrain from acting" set the Commonwealth's burden of proof too low.

"The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361 (1970). Trial courts are free to provide juries with a definition for reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Further, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a

---

Supreme Court review.

Finally, we reject the Commonwealth's suggestion to frame all of Thomas' claims as challenges to counsel's effectiveness, including those that assert trial errors. Our practice is to entertain the merits of the claims advanced. *See, e.g.*, *Fahy*, 516 F.3d at 189 ("Because there are no procedural barriers to our exercise of jurisdiction, we proceed to the merits of Fahy's habeas petition.").

18

reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id*. (internal citations omitted). Our task on review is to determine "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the reasonable doubt standard. *See id*. at 6 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 & n.4 (1991)).

The Pennsylvania Supreme Court has a long history of approving and recommending the "restrain from acting" formulation that the trial court used here to define reasonable doubt. In 1954, the Court included this formulation in its "standard and approved form of charge": a reasonable doubt "must be an honest doubt arising out of the evidence itself, the kind of a doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself)." *Commonwealth v. Donough*, 103 A.2d 694, 697 (Pa. 1954). Since then, the Court has affirmed the use of the "restrain from acting" formulation on many occasions. *See, e.g.*, *Commonwealth v. Marshall*, 810 A.2d 1211, 1225 (Pa. 2002) ("[W]e have explicitly approved of [reasonable doubt] instructions containing the word 'restrain' for nearly five decades." (citations omitted)); *Commonwealth v. Young*, 317 A.2d 258, 261–62 (Pa. 1974) ("[W]e have repeatedly placed our imprimatur on the charge expressed in *Commonwealth v. Donough* . . . ."); *Commonwealth v. Burns*, 187 A.2d 552, 560–61 (Pa. 1963) (defining reasonable doubt as expressed in

19

*Donough*).

The United States Supreme Court has not addressed whether the "restrain from acting" formulation is acceptable. Instead, it has repeatedly approved of defining reasonable doubt as "a doubt that would cause a reasonable person to *hesitate* to act." *Victor*, 511 U.S. at 20 (emphasis added).

Comparing the "hesitate to act" instruction with the "restrain from acting" formulation, we are inclined to agree with Thomas that the latter places a lower burden of proof on the prosecution. "Hesitate" implies a temporary interruption before acting. *See Webster's Third New Int'l Dictionary* 1061 (1966) ("hesitate . . . 1 a : to hold back in doubt or indecision : avoid facing a decision, encounter, or problem . . . b : to hold back from as if from scruple . . . 2 : to delay [usually] momentarily : Pause . . . 3 : Stammer . . . ."). "Restrain" suggests a more prolonged, if not permanent, period of inaction. *See id.* at 1936 ("restrain . . . 1 a : to hold (as a person) back from some action, procedure, or course : prevent from doing something (as by physical or moral force or social pressure) . . . b : to limit or restrict to or in respect to a particular action or course : keep within bounds or under control . . . 2 a : to moderate or limit the force, effect, development, or full exercise of : prevent or rule out excesses or extremes of . . . b : to keep from being manifested or performed . . . 4 a : to deprive of liberty : place under arrest or restraint b : to deprive (as of liberty) by restraint : abridge the freedom of . . . ." (obsolete definitions omitted)).

20

Accordingly, defining reasonable doubt as such a doubt that would "restrain" one's actions decreases, to some extent, the burden of proof that the prosecution would have to meet were the "hesitate to act" formulation employed instead.

Nonetheless, even though we believe that the "restrain from acting" formulation lessens the prosecution's burden of proof, we cannot say that its use is unconstitutional. The Supreme Court has never indicated that a reasonable doubt instruction must demand as much from the prosecution as the "hesitate to act" formulation does. Instead, the Court has merely described the "hesitate to act" formulation as a "common sense benchmark for just how substantial such a doubt must be." *Victor*, 511 U.S. at 20–21. It does not follow that any definition requiring more doubt than this benchmark is unconstitutional.

The Court has provided us with a standard for assessing the constitutionality of a reasonable doubt instruction: "'[T]aken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Id*. at 6 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). Applying this standard, the Court has approved of reasonable doubt instructions that defined the term as "the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon," *Holland*, 348 U.S.

21

at 140,[5] "not a mere possible doubt . . . [but] that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge," *Victor*, 511 U.S. at 7 (emphasis omitted), and "an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture," *id*. at 18 (emphasis omitted).

---

[5]The charge reviewed in *Holland* thus spoke in terms of a doubt sufficient to provide a basis for affirmative action in an important personal matter, as contrasted with the charge before us which spoke in terms of a doubt sufficient to provide a basis for choosing not to act in such a matter. Both, however, spoke of a doubt sufficient to control one's behavior, as contrasted with a doubt sufficient to cause one to "hesitate to act." In *Holland*, the Court expressed a preference for a "hesitate to act" charge but held that the charge given there was "not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some." 348 U.S. at 140. While we have concluded that the charge given here could be understood to lower the government's burden to some degree from that imposed by a "hesitate to act" charge, that degree is no greater than the degree of lowering in *Holland*, and we are confident that here, too, the charge was not of the type that could mislead the jury.

22

In contrast, the Court has held only one reasonable doubt instruction to be constitutionally deficient:

> *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.  A reasonable doubt is not a mere possible doubt.  *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain.  What is required is not an absolute or mathematical certainty, but a *moral certainty*.

*Cage v. Louisiana*, 498 U.S. 39, 40 (1990).  In *Cage*, the Court reasoned that "the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Id*. at 41.  The Court continued: "[w]hen those statements are then considered with reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id*.

Viewed against this jurisprudential background, we conclude that the reasonable doubt instruction used here was constitutional.  Although "restrain from acting" requires more doubt to acquit than "hesitate to act," it does not, by itself, so raise the threshold as to "suggest a higher degree of doubt than

23

is required for acquittal under the reasonable doubt standard." *See id*. at 41. As a result, the trial court's mere use of the word "restrain," though perhaps not ideal, is not enough to render its entire instruction unconstitutional.[6]

2.

Thomas' second claim is that the Commonwealth's closing argument at sentencing violated his due process and Eighth Amendment rights by inviting the jury to consider an improper sentencing factor—future dangerousness. He

---

[6]The Pennsylvania Supreme Court has also rejected arguments that the word "hesitate" must replace "restrain" in a proper reasonable doubt instruction. *See, e.g.*, *Commonwealth v. Brown*, 368 A.2d 626, 634 (Pa. 1976) (dismissing an "object[ion] to the use of the word 'restrain', and [the] suggest[ion that] 'hesitate' is a more appropriate standard"); *see also, e.g.*, *Commonwealth v. Porter*, 728 A.2d 890, 899 (Pa. 1999) ("[T]he distinction between 'hesitate before acting' and 'restrain before acting' is *de minimis* and clearly such a subtle variation in phrasing would not be an abuse of the trial court's discretion."). It has done so even though Section 7.01(3) of the Pennsylvania Suggested Standard Criminal Jury Instructions recommends providing juries with a definition of reasonable doubt that includes the word "hesitate." *See Commonwealth v. Collins*, 957 A.2d 237, 264 (Pa. 2008); *Commonwealth v. Rios*, 920 A.2d 790, 805–06 (Pa. 2007); *Commonwealth v. Carson*, 913 A.2d 220, 254 (Pa. 2006); *Porter*, 728 A.2d at 899–900.

24

contends that the Commonwealth's conduct was unconstitutional for two reasons: 1) it urged the jury to consider future dangerousness when contemplating the death penalty, which a jury cannot do under Pennsylvania law; and 2) it created an unacceptable risk that the jury believed, in error, that Thomas could be released on parole if he were not sentenced to death. Thomas also claims that trial counsel was ineffective for failing to object to the Commonwealth's argument or to seek curative instructions.

In reviewing the constitutionality of the Commonwealth's conduct at sentencing, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Here, at sentencing, the Commonwealth stated the following as part of its closing argument to the jury:

> There sits Brian Thomas, there sits convicted Brian Thomas. You have found what he did to Linda Johnson. You heard what happened to [the] three year old [whom he assaulted]. . . . You heard what happened to [the neighbor whose bedroom he trespassed into].
>
> It is not for me to say, it is not for the Judge to say. Only you can say enough. Only you can say stop.

25

I submit to you, ladies and gentlemen, that Brian Thomas has used up his chances. I would submit to you that it's time for somebody to say Brian Thomas, you have forfeited your right to live among civilized people by your conduct, by your behavior, what you did, why you did it and how you did it. You should not be allowed to continue.

There is not a cry here, ladies and gentlemen, for vengeance. There is not a cry here to bring back a person who is dead. [B]ut there is a cry here, ladies and gentlemen, for the type [of] person who would brutally beat, rape and sexual[ly] mutilate another human being. . . . [I]t's time for somebody to say in some way Brian Thomas, enough is enough. The citizens of Philadelphia can't tolerate you in their midst, take you out somewhere where your type [of] conduct will not ever be a threat to the citizens of Philadelphia again.

[* * *]

. . . I submit to you that based on your findings and based on the facts of this case, you must say there is no mitigation, the buck stops here, and for what you did, Brian Thomas, you should die. [Y]ou should die.

The Commonwealth's closing does not urge the jury to

26

consider Thomas' future dangerousness as a sentencing factor. Taken in isolation, certain statements may seem to border on such an appeal. But when viewed in context, the Commonwealth's message is clear: Thomas' crimes, both past and present, are so repulsive that they warrant the death penalty. The Commonwealth's references to Johnson's murder, Thomas' assault of the three-year-old, and his trespass into a neighbor's bedroom demonstrate that the Commonwealth was framing its argument with the aggravating circumstance that it sought to show at sentencing: Thomas' history of violent felonies. With that in mind, the Commonwealth's calls for the jury to "say enough," "say stop," and to tell Thomas that "[y]ou should not be allowed to continue," are plain allusions to its claim that "Brian Thomas has used up his chances," and that "the buck stops here, and for what you did, Brian Thomas, you should die." Indeed, the Commonwealth's use of the word "tolerate" and the phrase "your type [of] conduct" indicates that it wanted the jury to impose the death penalty because the "citizens of Philadelphia" had had enough of Thomas' past criminal conduct, not because Thomas could be a threat to society in the future. *Cf. Simmons v. South Carolina*, 512 U.S. 154, 157 (1994) (characterizing an argument that death "would be 'a response of society to someone who is a threat. Your verdict will be an act of self-defense'" as an argument to consider future dangerousness as a sentencing factor).

Nor does the Commonwealth's argument create an unacceptable risk that the jury believed that, if it did not impose

27

the death penalty, Thomas could be released on parole. Plainly, the Commonwealth never mentioned parole, and we do not read its argument as suggesting that Thomas could be paroled from a life sentence. As a result, the Commonwealth's conduct at sentencing was constitutional.[7]

3.

Thomas' third claim is that his trial counsel was ineffective for failing to life-qualify the jury—to determine that each juror could vote for a life sentence. *Strickland* sets the relevant test: Thomas must show that 1) his counsel's performance was deficient, and 2) his counsel's deficient performance caused him prejudice. 466 U.S. at 687. To be deficient, counsel's performance must fall below an objective standard of reasonableness. *Id*. at 687–88. To demonstrate prejudice, Thomas "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme

---

[7]Because we see no merit to Thomas' underlying claim of error, we also hold that counsel was not ineffective for failing to object. *See Moore v. Deputy Comm'rs of SCI-Huntingdon*, 946 F.2d 236, 245 (3d Cir. 1991) (concluding that counsel was not ineffective for failing to object where "there would have been no basis for the objection").

Court held that defendants had a right to life-qualify potential jurors at *voir dire*. At issue here is not whether Thomas' trial counsel should have known he had a right to ask life-qualifying questions at the time the jury was empaneled—six years before *Morgan* was decided. It is clear that he knew that he could: he asked one juror life-qualifying questions, and she responded that she could vote for a life sentence under certain circumstances. The only question in this case is whether counsel's failure to ask the rest of the jurors life-qualifying questions constituted ineffectiveness. We believe that it does not.

First, we note that the Supreme Court has never imposed an obligation on trial counsel to life-qualify a jury. *See Morgan*, 504 U.S. at 726 (framing the issue as "whether on voir dire the court must, *on defendant's request*, inquire into the prospective jurors' views on capital punishment" (emphasis added)).

Second, Thomas has not identified any relevant "[p]revailing norms of practice as reflected in American Bar Association standards and the like," *Strickland*, 466 U.S. at 688, that suggest that Thomas' counsel had an obligation to life-qualify the jury.

Third, the record does not indicate that Thomas' counsel had any reason to life-qualify any additional jurors. Thomas suggests that two jurors showed so much enthusiasm for the death penalty in their responses to the court's death-qualification question that they should have been life-qualified: 1) one juror

29

responded with "I believe in the death penalty" when asked whether he had "any moral, religious or ethical beliefs which could prevent [him] from voting for the death penalty in a proper case"; and 2) another juror answered "[n]o" before the court finished asking the question. To us, however, neither response is so indicative of a bias in favor of the death penalty that effective counsel would have asked to life-qualify these two jurors. There are a myriad of reasons why the first juror chose to use the words that he did, and the second juror chose to answer as quickly as he did. Without more, we will not speculate that they did so because of any enthusiasm for the death penalty.

Fourth, even if Thomas' counsel were deficient for failing to life-qualify every juror, Thomas has not shown prejudice. Since Pennsylvania's death sentence can only be imposed by a unanimous jury, *see* 42 Pa. Cons. Stat. § 9711(c)(iv), Thomas has demonstrated prejudice if "'there is a reasonable probability that, but for counsel's unprofessional errors . . .' one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty." *Bond v. Beard*, 539 F.3d 256, 285 (3d Cir. 2008) (quoting *Strickland*, 466 U.S. at 694). Thomas has provided not a shred of evidence suggesting any probability that, had his trial counsel life-qualified every juror, at least one juror would have voted to sentence Thomas to life imprisonment. He simply invites our speculation. Accordingly, Thomas' claim for habeas relief on this ground was properly denied.

30

IV.

We turn next to the issues that the Commonwealth raises on cross-appeal. The District Court granted Thomas sentencing relief because it determined that two of his claims had merit: 1) Thomas' trial counsel was ineffective for failing to investigate and present mitigating evidence, and 2) Thomas' waiver of his right to present mitigating evidence was not made knowingly and intelligently. *Thomas III*, 388 F. Supp. 2d at 505–11, 513–16. On cross-appeal, the Commonwealth argues that the District Court erred in vacating Thomas' sentence because 1) the District Court applied the wrong standard of review, 2) there is insufficient evidence that Thomas' counsel failed to investigate mitigating evidence, and 3) any deficiency by counsel did not prejudice Thomas.

A.

The Commonwealth claims that the District Court erred in reviewing Thomas' ineffective assistance and waiver claims *de novo* because they were "adjudicated on the merits" by the Pennsylvania Supreme Court, and AEDPA deference pursuant to Section 2254(d) is warranted. We disagree.

It is clear that Thomas raised both the ineffective assistance and waiver claims in state court. On direct appeal, Thomas asserted that he did not waive his right to present mitigating evidence knowingly and intelligently. Indeed, he

31

submitted an affidavit that set out the factual basis for this claim:

> I did not then understand that I could present evidence concerning my character as a mitigating circumstance during the penalty phase. I was under the belief that I could only present evidence relating to the circumstances of the offense. This is the reason why I declined to present any testimony at the penalty hearing. . . . At no time did my attorney explain to me that evidence concerning my character could or should be presented for the jury's consideration at the penalty hearing.

In his PCRA petition, Thomas repeated this claim, and added an allegation that counsel was ineffective for failing to investigate and present mitigating evidence that was available at the time of his sentencing.

Even though Thomas raised these claims during the course of the state court proceedings, no state court actually adjudicated them on their merits. The PCRA court and the reviewing Pennsylvania Supreme Court declined to reach the merits of each. Instead, both courts determined that the claims "have previously been decided by [the Pennsylvania Supreme Court] on direct appeal." *Thomas II*, 744 A.2d at 714 & n.3. In reaching that conclusion, both courts were mistaken. First, the Pennsylvania Supreme Court could not have addressed Thomas'

32

ineffective assistance claim on direct appeal because he raised it for the first time in his PCRA petition. Second, on direct appeal, the Pennsylvania Supreme Court never determined whether Thomas knowingly and intelligently waived his right to present mitigating evidence. On direct appeal, the Pennsylvania Supreme Court addressed only one mitigating evidence issue: whether Thomas understood that he *could* present mitigating evidence. *Thomas I*, 561 A.2d at 710 ("Finally, Appellant complains that his trial counsel did not advise him that *he could put on evidence* of mitigating circumstances and that this omission was prejudicial ineffectiveness." (emphasis added)). But Thomas' waiver claim raised a completely different issue: he asserted that his waiver was not knowing and intelligent because he did not understand the *nature and purpose* of mitigating evidence. Therefore, no state court actually decided the claims that formed the basis of the District Court's decision to grant Thomas habeas relief.

The Commonwealth points out that the Pennsylvania Supreme Court, in reviewing Thomas' PCRA petition, stated that "[t]he issue of the presentation of mitigating evidence, in all its possible manifestations, was determined by this Court's previous decision." *Thomas II*, 744 A.2d at 714 n.3. The Commonwealth urges us to accept the Pennsylvania Supreme Court's statement at face value and view Thomas' claims as "adjudicated on the merits." This we cannot do. For the purposes of determining whether there was an "adjudication on the merits" in state court, what matters most is what the state

33

court actually did, not what it said it did. We cannot blindly accept a court's *ex post* characterization of its prior action when that characterization is at odds with what we conclude the court's prior action plainly was.

"[I]f an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply." *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002). Here, the record plainly shows that while Thomas raised the claims at issue in state court, the state courts did not reach their merits. Accordingly, there was no "adjudication on the merits," and the District Court was correct in reviewing the claims *de novo*. *See Appel*, 250 F.3d at 210.

B.

The District Court addressed Thomas' ineffective assistance and waiver claims together, *Thomas III*, 388 F. Supp. 2d at 504, but Thomas' ineffective assistance claim was the focal point of its analysis. First, the District Court concluded that trial counsel was ineffective for failing to investigate and present mitigating evidence. *Id*. at 505–11. Second, the District Court determined that Thomas' waiver of his right to present mitigating evidence did not cure the prejudice caused by counsel's deficiency because the waiver was not made knowingly and intelligently. *Id*. at 513–16. Accordingly, in

34

reviewing the District Court's decision and the merits of the Commonwealth's cross-appeal, we will concentrate on Thomas' ineffective assistance of counsel claim.

The Commonwealth directs our attention to the evidentiary record that Thomas is obligated to produce in support of his ineffective assistance claim. It points out that courts assessing attorney performance must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Here, the Commonwealth sees no evidence on the record concerning the extent, if any, of Thomas' counsel's pre-sentencing investigation into mitigating evidence. It argues that, based on such a record, Thomas cannot possibly demonstrate that his counsel was deficient. Accordingly, the Commonwealth asserts that we must deny Thomas' request for habeas relief.

We agree with the Commonwealth that the record is sparse. The only documentary evidence directly pointing to a failure to investigate is a declaration from Thomas' aunt, signed nine years after Thomas' sentencing, that states that no attorney or investigator asked her about Thomas' life and mental health while he was on trial. But Thomas has sought to prove that trial counsel did not investigate, so Thomas' failure to discover evidence of an investigation is itself a sign that none occurred. Therefore, it is entirely appropriate for us to consider what Thomas has looked for, but cannot find. Here, after Thomas purportedly waived the presentation of mitigating evidence,

35

there was no proffer from counsel identifying the investigative measures he had undertaken, or what evidence he was prepared to present. Additionally, a search of the state court file, where Thomas' court-appointed counsel and the court would have lodged certain case-related documents, yielded nothing suggesting an investigation—no request for a mitigation investigator, no request for funds for a mitigation investigation, no request for a defense mental health expert, and no subpoenas for mental health records. Had Thomas' counsel performed any investigation, we would expect either some mention of it in open court or some "paper trail" suggesting it in the record of proceedings. The absence of both implies that counsel did no investigating.

Nonetheless, from this record, we cannot simply jump to the conclusion that Thomas' counsel was deficient. Counsel's performance enjoys a presumption of effectiveness, and we must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 689–90. "A reviewing court cannot make such a determination on a clean slate." *Marshall*, 307 F.3d at 106. This means that based on the present record, we cannot affirm the District Court's conclusion that Thomas' counsel was deficient at sentencing.

We by no means go so far as to deny Thomas the possibility of relief. This is not the first time we have been asked to determine counsel's effectiveness where "the picture is

less than complete." *Id*. In *Marshall*, we also had "no record before us as to what preparation or investigation, if any, was performed by counsel in anticipation of the penalty phase . . . ." *Id*. We therefore "conclude[d] that a District Court hearing is essential, and remand[ed] for a new ruling by the District Court as to *Strickland* based upon a complete record." *Id*. at 117. Likewise, we believe that any resolution of Thomas' *Strickland* claims here is premature without the benefit of an evidentiary hearing. Accordingly, we will remand the case for a hearing concerning the extent, if any, of Thomas' counsel's pre-sentencing investigative efforts to obtain mitigating evidence.

## C.

The Commonwealth urges that an evidentiary hearing would be inappropriate for two reasons: 1) Thomas has failed to develop a factual record in state court, so a hearing would be barred by 28 U.S.C. § 2254(e)(2); and 2) even if counsel were deficient, Thomas cannot prevail because he was not prejudiced. Neither of these arguments are persuasive.

## 1.

First, Thomas did not "fail[] to develop the factual basis of a claim in State court" in such a way that causes Section

37

2254(e)(2) to bar an evidentiary hearing.[8] "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id*. at 435. In *Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005), we concluded that the petitioner's request for an evidentiary hearing in the state post-conviction court, which was denied, showed sufficient diligence to render Section 2254(e)(2) inapplicable. *Id*. at 498. Likewise, here, Thomas requested an evidentiary hearing in the PCRA court to develop the factual record for his claim that trial counsel failed to investigate mitigating evidence. Therefore, Section 2254(e)(2) does not apply. *See also Williams*, 529 U.S. at 437 ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.").

---

[8]According to 28 U.S.C. § 2254(e)(2)'s opening clause, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim . . . ." Sections 2254(e)(2)(A) and (B) list three exceptions to the opening clause, which are not at issue here.

Second, without a fully developed record, we cannot foreclose the possibility that Thomas will be able to show prejudice—a reasonable probability that, but for counsel's deficiency, one juror would have voted to impose a sentence of life imprisonment. *See Bond*, 539 F.3d at 285. In Pennsylvania, the jury must impose a sentence of life imprisonment unless it unanimously finds that the aggravating circumstances outweigh the mitigating circumstances. 42 Pa. Cons. Stat. § 9711(c)(iv). "[E]xtreme mental or emotional disturbance" is specifically listed as a mitigating circumstance that Pennsylvania juries may consider when deciding whether to impose the death penalty. 42 Pa. Cons. Stat. § 9711(e)(2). Here, the Commonwealth does not dispute that even the most cursory search would have yielded evidence of Thomas' long history of mental illness. This history includes a court commitment to a psychiatric hospital when Thomas was sixteen, and a mental health evaluation when he was eighteen that described him as having "responses . . . similar to those in the literature describing paranoid schizophrenia," and "serious mental disturbance." Additionally, had counsel sought to examine Thomas' mental health prior to his sentencing, the results likely would have revealed some mental illness: according to a court-ordered psychological evaluation conducted the day of Thomas' sentencing,

> [a]t the present time, this Defendant can be best described as suffering from Severe Multiple Personality Disorders, and continues to indicate Sociopathic, Reactive Paranoid, and Schizoid

39

Traits. There is continued indication, both clinically as well as on psychological testing, of a great deal of underlying psychopathology which is clearly focused in the sexual area, with indication of sexual identity confusion, hostility and ambivalence toward women, and indication of very primitive, brittle, and inadequate controls.

Placed in the hands of effective counsel, there is a reasonable probability that this evidence would have persuaded at least one juror to impose life imprisonment rather than the death penalty.

2.

The Commonwealth argues that even assuming that effective counsel would have discovered Thomas' mental health history, no prejudice could have resulted because Thomas would not have let his counsel present any mitigating evidence. The Commonwealth asserts that *Schriro v. Landrigan*, 550 U.S. 465 (2007), and *Taylor v. Horn*, 504 F.3d 416 (3d Cir. 2007), are indistinguishable from the present case and require us to hold that there is no prejudice here. We disagree.

In *Landrigan*, the Supreme Court confronted for the first time "a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court." 550 U.S. at 478. There, the petitioner's counsel informed the trial court that he had advised the petitioner "very strongly" that

the petitioner should present mitigating evidence. *Id*. at 469. The trial court questioned the petitioner, and the petitioner confirmed that he instructed his counsel not to present mitigating evidence and that he understood the consequences. *Id*. When the petitioner's counsel was proffering, at the court's request, the mitigating evidence he intended to present, the petitioner interrupted multiple times to explain away the mitigating characteristics of the evidence, and also to reaffirm that he did not want the evidence presented in court. *Id*. at 470. Finally, at the end of the sentencing hearing, the petitioner stated that "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id*. Applying AEDPA's deferential standard of review, the Supreme Court determined that the state appellate court reasonably concluded that the petitioner had refused to allow the presentation of mitigating evidence, and this refusal prevented any showing of prejudice. *Id*. at 475–77.

In *Taylor*, the petitioner wrote a confession letter to the police, which stated that "I want the maximum sentence." 504 F.3d at 421. At the petitioner's guilty plea hearing, the petitioner agreed with his counsel's statement that he had instructed counsel not to contact any witnesses or to call any medical personnel who had spoken to him, and that he understood that "the likely result will be imposition of the death penalty." *Id*. At sentencing, the petitioner informed the court that he declined to present any mitigating evidence. *Id*. at 422. The court then sentenced the petitioner to death. *Id*. In the

41

subsequent state post-conviction relief proceedings, the state court conducted an evidentiary hearing, denied the petitioner's request for relief, and found that the petitioner had discussed the possibility of presenting testimony of mitigating circumstances with his counsel, that the petitioner rejected the idea of doing so, and that the petitioner personally called potential witnesses to tell them not to attend his sentencing. *Id*. at 424. The state appellate court affirmed these findings and the court's holding. *Id*.; *see also Commonwealth v. Taylor*, 718 A.2d 743 (Pa. 1998).

Applying AEDPA's deferential standard of review, we determined in *Taylor* that the state post-conviction court's factual and legal conclusions were reasonable. 504 F.3d at 452, 455. Comparing the petitioner to the one in *Landrigan*, we agreed with the petitioner that "he was not belligerent and obstructive in court like the defendant in *Landrigan* . . . , but the record shows that his determination not to present mitigating evidence was just as strong." *Id*. at 455. As a result, "whatever counsel could have uncovered, [the petitioner] would not have permitted any witnesses to testify, and was therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence." *Id*.

The Commonwealth claims that like the petitioners in *Landrigan* and *Taylor,* Thomas would have prevented his counsel from presenting any mitigating evidence, no matter what it was, thus obviating any possibility of prejudice. It points to Thomas' conduct at his sentencing for factual support. Yet

42

based on our review of the record, we believe that both *Landrigan* and *Taylor* differ significantly from the present case. As an initial matter, AEDPA deference pursuant to Section 2254(d) constrained federal review in both *Landrigan* and *Taylor*. It does not apply here. *See supra* Part IV.A. This means that while the Pennsylvania courts' determinations of factual issues "shall be presumed to be correct," we review *de novo* the mixed question of law and fact of whether Thomas can show prejudice. *See Appel*, 250 F.3d at 210.

Moving to the merits of the Commonwealth's argument, we cannot conclude that Thomas would have interfered with the presentation of all mitigating evidence. Thomas' colloquy at sentencing focused narrowly on whether he wanted to take the stand himself:

> [THOMAS' COUNSEL]: Mr. Thomas, you recall during the case in chief that we inquired as to whether or not you wanted to testify on your own behalf. Do you recall that?
>
> [THOMAS]: Yeah, I do. Why do I answer all these questions before? We done be over that already. No, I don't want to get on the stand.
>
> THE COURT: Well, this is a different portion.
>
> [THOMAS]: I still don't want to get on the stand.

43

THE COURT: Under no conditions?

[THOMAS]: No.

THE COURT: Is this your decision?

[THOMAS]: Yes, it is.

THE COURT: Did you discuss it with your lawyer, Mr. Watson?

[THOMAS]: Yes.

THE COURT: And you already told him, I would like to repeat, but it's your decision not to take the stand at this penalty stage of the hearing or even to present any evidence. Is that your independent and voluntary decision?

[THOMAS]: It is.

We acknowledge what is plainly of record: the sentencing court did ask Thomas to confirm that "it's your decision not to . . . present any evidence." Yet we cannot ignore that this question was part of a compound question that also asked Thomas to reaffirm that "it's your decision not to take the stand," and the remainder of the questions in the colloquy only concerned Thomas' desire to testify on his own behalf. Accordingly, Thomas' terse answer to this inquiry does not display an intent to interfere with the presentation of mitigating evidence that is

44

strong enough to preclude a showing of prejudice.  To us, the only thing that Thomas clearly disclaimed at his colloquy was a desire to testify on his own behalf.

The followup questions asked by the Commonwealth fare even worse.  At most, Thomas' responses indicate that he had no witnesses to call at his sentencing:

> [THE COMMONWEALTH]: Mr. Thomas, do you have any witnesses that you would like to call at this time at this stage of the proceeding?
>
> [THOMAS]: No.
>
> [THE COMMONWEALTH]: Are you sure about that?
>
> [THOMAS]: No.
>
> [* * *]
>
> THE COURT: You mean no, you don't have any witnesses to call.
>
> [THOMAS]: Right.
>
> [THE COMMONWEALTH]: There is no witness in existence you would like to call, sir, at this time.  Yes or no?

[THOMAS]: I said no.

This exchange provides no support for the Commonwealth's argument that Thomas would have prevented the presentation of all mitigating evidence.

Nor does Thomas' refusal to stipulate to his age and education tip the scales in the Commonwealth's favor. We agree with the Commonwealth that Thomas' age and education are relatively innocuous facts, and Thomas' decision not to stipulate to them is odd. We cannot agree, however, that this proves that Thomas was not prejudiced. While Thomas' refusal to stipulate is consistent with the Commonwealth's position, it is equally consistent with other scenarios that the record supports. Indeed, Thomas has claimed that he did not understand the nature and purpose of mitigating evidence. Thomas' failure to stipulate could be viewed as a symptom of this fundamental misunderstanding, and not as an affirmative declaration against the presentation of all mitigating evidence.

In sum, this case bears no resemblance to *Landrigan* and *Taylor*. Thomas never indicated that he would interfere with or otherwise prevent the presentation of all mitigating evidence, regardless of its nature. At sentencing, Thomas' colloquy focused on two very specific questions: 1) whether he desired to testify on his own behalf; and 2) whether he had any other witnesses to call. That he answered "no" to both does not mean that, had effective counsel prepared mental health evidence, he

46

would have also declined its presentation. Therefore, we cannot conclude that Thomas' conduct at sentencing eliminated all possibility that counsel's performance caused him prejudice.[9]

3.

The Commonwealth also argues that Thomas was not prejudiced because the evidence of Thomas' mental health history aggravated more than it mitigated. The Commonwealth points to various negative statements in Thomas' psychological evaluations, including those that described him as having "little understanding of his social and moral responsibility," and as a "sexual deviate with sadistic tendencies." Some of these evaluations even recommended Thomas' incarceration because "he is a serious threat in the community," and "a dangerous criminal." The Commonwealth also notes that certain evaluations documenting Thomas' mental health history referenced two other criminal incidents that the Commonwealth

---

[9]In assessing Thomas' ability to show prejudice under *Strickland*, the only question we answer here is whether Thomas would have waived his right to present mitigating evidence had he been represented by effective counsel. As a result, we offer no opinion on whether a waiver of the right to present mitigating evidence must be "informed and knowing." *See Landrigan*, 550 U.S. at 479 ("We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence.").

47

did not introduce at sentencing: 1) in 1975, Thomas sodomized five police horses with a broom handle, killing one of them; and 2) in 1976, Thomas sexually assaulted an infant girl. As a result, the Commonwealth questions not only whether the inclusion of Thomas' mental health history could have possibly changed the result of his sentencing, but also whether effective counsel would have even introduced any of it for the jury's consideration.

While we agree with the Commonwealth that some of Thomas' mental health history paints him in a negative light, we are not convinced that the death penalty is a *fait accompli* even if evidence of Thomas' mental health history were available at sentencing. Certainly, evidence that Thomas is a sadistic and dangerous sexual deviate who committed at least one prior act that bears resemblance to the crime in this case is not mitigating. Additionally, the quantity of aggravating evidence that the jury already did consider was significant. But Thomas' mental health history acts as a common thread that ties all this evidence together. A single juror may well have believed that this unifying factor explained Thomas' horrific actions in a way that lowered his culpability and thereby diminished the justification for imposing the death penalty. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to emotional and mental problems, may be less culpable than defendants who have no such excuse.'"

48

(quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring))). Therefore, there exists a reasonable probability that effective counsel would have chosen to present evidence of Thomas' mental health history, and that its presentation would have convinced at least one juror to sentence Thomas to life imprisonment. While Thomas' crimes were heinous, and while it may be that the death penalty was properly imposed, we cannot conclude, on this record, that he was not prejudiced by trial counsel's alleged deficiencies at sentencing.

V.

We agree with the District Court that Thomas cannot prevail on the three claims before us on his appeal, but we disagree with the District Court that Thomas' sentence should be vacated. Although the absence of any evidence of a pre-sentencing investigation in this case seems to suggest that none occurred, it is simply not sufficient to overcome the presumption of effectiveness that we are bound to apply. As a result, we will vacate the District Court's sentencing decision, and remand the case for an evidentiary hearing concerning the extent, if any, of Thomas' counsel's pre-sentencing investigative efforts to obtain mitigating evidence.

49