Reginald S. LEWIS, Appellant,

v.

Commissioner Martin HORN, Pennsylvania Department of Corrections; Connor Blaine, Superintendent of the State Correctional Institution at Graterford; Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview Martin Horn, Connor Blaine and Joseph P. Mazurkiewicz, Appellants.

Nos. 06–9007, 06–9008.

United States Court of Appeals, Third Circuit.

Argued Aug. 4, 2009.

Filed: Sept. 14, 2009.

Matthew C. Lawry, Billy H. Nolas (Argued), Defender Association of Philadelphia, Federal Capital Habeas Corpus Unit, Philadelphia, PA, for Reginald Lewis.

Joshua S. Goldwert (Argued), Thomas W. Dolgenos, Ronald Eisenberg, Arnold H. Gordon, Lynne Abraham, Office of the District Attorney, Philadelphia, PA, for Martin Horn, Connor Blaine and Joseph P. Mazurkiewicz.

Before: SMITH, FISHER and VAN ANTWERPEN, Circuit Judges.

## OPINION OF THE COURT

FISHER, Circuit Judge.

In this appeal, we are presented with the difficult task of considering a Pennsylvania death row inmate's challenges to his conviction and sentence, stemming from a trial that occurred over twenty-five years ago. Appellant Reginald Lewis filed a petition for a writ of habeas corpus in the District Court seeking relief from his judgment of conviction and sentence. The District Court denied Lewis relief from his conviction, rejecting his arguments that the Commonwealth's use of peremptory strikes violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that his counsel was ineffective during the guilt phase of his trial, and that the Commonwealth suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But the District Court was persuaded by Lewis's arguments that his counsel rendered constitutionally ineffective assistance at the penal-

ty phase of his trial and therefore granted relief to Lewis from his death sentence. Because we conclude that the District Court committed several errors in its analysis of this claim, we will vacate its order granting sentencing relief, and remand for further proceedings consistent with this opinion. We will affirm the District Court in all other respects.

## I.

At approximately 6:30 p.m. on November 21, 1982, Christopher Ellis was brutally stabbed nine times by a man wielding a butcher knife in the Oxford Bar, located on Oxford and Sixth Streets in Philadelphia, Pennsylvania. The stabbing was observed by all of the patrons of the bar, including the group that accompanied Ellis to the bar to celebrate the birthday of one of the members. Following the incident, the police showed each of the witnesses a photoarray of eight pictures, one of which depicted Lewis, and each witness identified Lewis as the person who committed the murder. Subsequently, when the police arrested Lewis for shoplifting from a department store, he had assumed the name of Booker T. Beatty, Jr. While still in police custody on that charge, Lewis was arrested pursuant to an outstanding warrant and charged with the murder of Christopher Ellis.

### A. Trial and Direct Appeal

Over the course of the trial in the Court of Common Pleas of Philadelphia County, the prosecution produced six eye-witnesses who identified Lewis as the individual they had seen commit the murder. Each witness had been familiar with Lewis as a person who "hung around" the neighborhood. They all knew him by his first name only, "Reggie" or Reginald. There was also testimony that frequently Lewis was seen wearing clear lens, "schoolboy" glasses prior to the incident, similar to the glasses dropped by the assailant at the scene of the murder. One witness testified that immediately prior to the stabbing Lewis and Ellis were arguing over a five dollar debt Ellis allegedly owed Lewis. The bartender testified that the assailant was a previous customer at the bar and had a girlfriend named Stephanie, who was pregnant at the time and lived on the 1600 block of Marshall Street in Philadelphia. The Commonwealth produced Lewis's fiancée, Stephanie McCorey, who testified she was pregnant at the time of the incident and had previously resided at 1610 N. Marshall Street. The bartender also testified that Lewis approached him the next day and told him not to mention Lewis's name with regard to the incident. In defense, Lewis maintained he was in San Diego visiting his brother, Michael, at the time of the incident. In support of this claimed alibi defense, Lewis produced his brother and other family members to corroborate the story.

On August 1, 1983, the jury found Lewis guilty of first-degree murder and possession of an instrument of crime. During the penalty phase,[1] the Commonwealth sought to establish the aggravating circumstance of "a significant history of felony convictions involving the use or threat of violence to the person," see 42 Pa. Cons. Stat. Ann. § 9711(d)(9), offering evidence of Lewis's 1973 aggravated assault conviction in Philadelphia, and his 1976 first-degree murder and felony assault convictions in Camden, New Jersey. Lewis in

---

1. In a Pennsylvania jury trial, after a first-degree murder verdict "is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment." 42 Pa. Cons.Stat. Ann. § 9711(a)(1).

turn testified in an attempt to downplay his culpability and minimize the violence of his prior convictions, and his counsel, in closing argument, emphasized Lewis's youth at the time of the prior offenses. After approximately one hour of deliberation, the jury returned its verdict, finding one aggravating circumstance and no mitigating circumstances, and sentencing Lewis to death on the first-degree murder conviction.

Lewis, represented by new counsel, filed a direct appeal to the Pennsylvania Supreme Court, which, on December 22, 1989, affirmed his judgment of conviction and sentence. *Commonwealth v. Lewis,* 523 Pa. 466, 567 A.2d 1376 (1989) (*Lewis I*). In his direct appeal, Lewis raised a number of arguments, including a challenge to the Commonwealth's use of peremptory strikes during jury selection. Although Lewis did not cite *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which the United States Supreme Court decided during the pendency of Lewis's direct appeal, he included a short argument in his brief under the heading "Defendant Was Denied His Constitutional Right To A Fair Trial By A Jury Of His Peers By The Improper Use of Peremptory Challenges By The Commonwealth," which stated the following:

> "Appellant wishes to preserve this argument and alleges the Commonwealth unfairly and improperly used its peremptory challenges to exclude members of Appellant's race (Black) from the jury. Counsel requests this issue be remanded for an evidentiary hearing to determine the validity of the assertion."

(App. at 1891.) In rejecting Lewis's *Batson* claim, the Pennsylvania Supreme Court noted Lewis's "failure to identify specific veniremen or specific parts of the record in support of his allegation," and reasoned that "absent a prima facie showing of improper use of peremptory challenges by the Commonwealth, this claim could not provide a basis . . . to vacate the judgment of sentence." *Lewis I,* 567 A.2d at 1381 n. 3. The Pennsylvania Supreme Court rejected the remainder of Lewis's arguments, none of which is relevant to the current appeal.

## B. State Post–Conviction Proceedings

On August 7, 1995, almost six years after the Pennsylvania Supreme Court affirmed Lewis's conviction and sentence on direct appeal, Lewis filed a timely pro se petition for post-conviction relief under Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. Cons.Stat. Ann. § 9541 *et seq.*[2] In this petition, Lewis argued that his counsel was ineffective at the guilt phase of his trial for failing to object during voir dire to what he alleged was the Commonwealth's discriminatory use of peremptory strikes. Additionally, Lewis argued that his counsel was ineffective at the penalty phase of his trial for conducting "no investigation geared toward the penalty hearing" and for presenting "no information regarding [his] mental illness." On November 20, 1995, counsel was appointed to represent Lewis in his PCRA proceeding, and on April 10, 1996, Lewis's counsel filed an amended PCRA petition, followed by a supplemental amended petition and memorandum of law filed on June 18, 1996. On January 15, 1997, the PCRA court issued a ten-day notice of dismissal

---

**2.** Lewis's PCRA petition was timely because he filed it before an amendment to the PCRA went into effect in January 1996, which created a one-year filing deadline from the date judgment becomes final. *See* 42 Pa. Cons.

Stat. Ann. § 9545(b); *see also Bronshtein v. Horn,* 404 F.3d 700, 708 (3d Cir.2005) (discussing when the one-year filing deadline became a firmly established and regularly followed rule).

of Lewis's petition. In response, Lewis's current counsel, who had assumed representation of him, filed objections to the proposed dismissal. In Lewis's objections to the notice of dismissal, he expanded on his claim of ineffective assistance of counsel at the penalty phase, and he also argued that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not providing exculpatory evidence of certain bus tickets allegedly located in a briefcase he was carrying at the time of his arrest.

On February 7, 1997, the PCRA court denied Lewis's petition without conducting a hearing. Lewis appealed to the Pennsylvania Supreme Court, elaborating on the arguments he raised before the PCRA court and also adding to his arguments a claim that his trial counsel was ineffective at the guilt phase of his trial for failing to adequately prepare alibi witnesses and for failing to investigate a defense of self defense. On January 19, 2000, the Pennsylvania Supreme Court affirmed the denial of Lewis's petition, holding: (1) the *Batson* claim was previously litigated on direct appeal and could not be reconsidered; (2) the ineffective assistance of counsel at the guilt phase claim was waived because it was raised for the first time on appeal from the PCRA court's dismissal of Lewis's petition; (3) the *Brady* claim failed because the bus ticket did not support an alibi defense as there was no indication of a date of travel and the briefcase containing the ticket was not in the custody of the police; and (4) the ineffective assistance of counsel at the penalty phase claim failed because the record did not support Lewis's contention that he suffers from brain damage or serious mental illness. *Commonwealth v. Lewis*, 560 Pa. 240, 743 A.2d 907

(2000) (*Lewis II*). The Pennsylvania Supreme Court rejected several other arguments raised by Lewis, none of which are relevant to the instant appeal.

## C. Federal Habeas Proceedings

In September 2000, Lewis filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Pennsylvania alleging sixteen separate grounds for relief, only some of which the District Court reached.[3] *Lewis v. Horn*, 2006 WL 2338409 (E.D.Pa. Aug.9, 2006). In reviewing Lewis's *Batson* claim, the District Court applied the deferential standard set forth in § 2254(d) and concluded that "the Pennsylvania Supreme Court reasonably applied *Batson* in determining that [Lewis] failed to make a prima facie claim of discriminatory jury selection." *Id.* at *13. The District Court also rejected Lewis's argument that his appellate counsel was ineffective for failing to raise the *Batson* claim in a professionally reasonable manner on direct appeal, concluding that "[b]ecause [Lewis] cannot establish a prima facie case under *Batson*, his claim of ineffective assistance of counsel for failure to raise this claim must also fail." *Id.* at *12 n. 12. The District Court also denied Lewis's request for an evidentiary hearing on the *Batson* claim under § 2254(e)(2) because of Lewis's failure to develop the factual record necessary to support this claim. *Id.* at *14. In support of these conclusions, the District Court observed that Lewis had "failed to object to any of the Commonwealth's peremptory challenges on the basis that they were being exercised in a racially discriminatory manner," and also noted that there was "no record of the racial make-up of the

---

**3.** We limit our discussion of the claims reached by the District Court to those which are relevant to the instant appeal.

venire," and no "record of the race of those stricken jurors nor any indication as to the racial composition of the jury that tried and sentenced [Lewis]." *Id.* at *13–14.

Turning to Lewis's claim of ineffective assistance of counsel at the guilt phase of his trial, the District Court exercised de novo review, reasoning that the Pennsylvania Supreme Court's refusal to reach the issue because of waiver was not an independent and adequate ground for declining to address the merits of the claim in light of Pennsylvania's relaxed waiver doctrine in capital cases, which was in effect at the time of Lewis's alleged procedural default. *Id.* at *4, *14 n. 14. The District Court determined that Lewis's "contention that the failure of the alibi defense was the result of trial counsel's lack of preparation is not supported by the record," and therefore concluded that his counsel's presentation of the alibi defense "did not fall below an objective standard of reasonableness as defined by *Strickland* [*v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ]." *Id.* at *15. The District Court also concluded that Lewis's counsel did not perform deficiently by making a strategically reasonable choice "not to present a theory of self-defense that would be factually inconsistent with and thereby undermine the credibility of [Lewis's] alibi defense." *Id.* at *16.

Next, the District Court reviewed Lewis's *Brady* claim, applying § 2254(d)'s deferential standard to the Pennsylvania Supreme Court's decision on the merits of this issue. *Id.* at *16 n. 15. The District Court denied the claim, explaining that "this Court cannot conclude that the Pennsylvania Supreme Court unreasonably applied the principals [sic] of *Brady* to this claim" and that Lewis "has not demonstrated that the state court unreasonably determined the facts based on the evidence." *Id.* at *17. Notwithstanding its

conclusions, the District Court granted a certificate of appealability to Lewis as to these three guilt phase claims. *Id.* at *19.

As for Lewis's ineffective assistance of counsel at the penalty phase claim, the District Court stated that "the Pennsylvania Supreme Court reached the merits of this claim," and consequently it would "apply [§ 2254(d)'s] deferential standard of review." *Id.* at *5 n. 6. The District Court determined: "The evidence that [Lewis] has presented, both in the PCRA courts and in his habeas proceedings, reveals that he does in fact suffer from a host of mental health issues, many of which may be attributable to his deeply troubled family background." *Id.* at *6. Consequently, the District Court concluded that "there can be no reason, strategic or otherwise for trial counsel's failure to investigate and present mitigating evidence." *Id.* at *11. Because of this, the District Court held that the Pennsylvania Supreme Court unreasonably applied the *Strickland* and *Terry Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) standards in assessing whether Lewis's "trial counsel rendered constitutionally ineffective assistance at the sentencing phase." *Id.* While noting that "[t]he Pennsylvania Supreme Court did not reach the prejudice inquiry," *id.* at *12 n. 10, the District Court determined that Lewis was prejudiced by his counsel's performance at the penalty phase of his trial, reasoning that "[h]ad the jury heard the evidence regarding [Lewis's] life history and the conclusions reached by some of the mental health experts, there is a reasonable probability that at least one juror would have found the mitigating circumstances to outweigh the aggravating circumstances." *Id.* at *12. As a result of these conclusions, the District Court granted Lewis's writ of habeas corpus and "direct[ed] that he either be given a new sentencing hearing or sentenced to life imprisonment." *Id.* Because

the District Court granted relief to Lewis on this ground, it declined to reach his other claims for relief from his sentence.

Following the District Court's decision, Lewis timely appealed and the Commonwealth cross-appealed.

## II.

■■■ The District Court had jurisdiction under 28 U.S.C. §§ 2254 and 2241, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because the District Court ruled on Lewis's habeas petition without conducting an evidentiary hearing, our review of its legal conclusions is plenary. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir.2001). Accordingly, we will "review the state courts' determinations under the same standard that the District Court was required to apply." *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir.2009). Following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), habeas relief cannot be granted by a federal court on a claim that was "adjudicated on the merits" in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[F]or the purposes of [§ ] 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground." *Thomas v. Horn*, 570 F.3d at 117. But when "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001). "In such an instance, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Id.* Additionally, regardless of whether a state court reaches the merits of a claim, a "federal habeas court must afford a state court's factual findings a presumption of correctness and ... the presumption applies to factual determinations of state trial and appellate courts." *Fahy v. Horn*, 516 F.3d 169, 181 (3d Cir.2008).

## III.

### A. *Batson* Claim

Lewis argues that he should be granted relief from his conviction, or at least receive an evidentiary hearing, based on his claim that the prosecutor's jury selection was racially discriminatory in violation of the Equal Protection Clause as articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). More specifically, Lewis contends that he has established a prima facie case of racial discrimination and that the Commonwealth has not offered race-neutral reasons for the prosecutor's peremptory strikes. He alleges that the facts of this case demonstrate a pattern of discriminatory strikes because the prosecutor used eight peremptory challenges against African American venire members and only four against white venire members, which resulted in an empaneled jury that consisted of all-white jurors. He also makes allegations about the discriminatory culture of the Philadelphia District Attorney's Office at the time of his trial.

Lewis raised this claim for the first time on direct appeal to the Pennsylvania Supreme Court. At that time, he did not provide any factual support for his claim,

but merely asserted that "the Commonwealth unfairly and improperly used its peremptory challenges to exclude members of [Lewis's] race (Black) from the jury." (App.1891.) The Pennsylvania Supreme Court observed that Lewis failed to "identify specific veniremen or specific parts of the record in support of his allegation," and denied relief from conviction on this ground because of Lewis's failure to make "a prima facie showing of improper use of peremptory challenges by the Commonwealth." *Lewis I*, 567 A.2d at 1381 n. 3. Lewis reiterated the *Batson* claim in his amended PCRA petition, but he did not provide any factual support for this claim until he submitted objections to the PCRA court's notice of dismissal, at which time he asserted that the Commonwealth struck eight African American venire members. On appeal to the Pennsylvania Supreme Court, Lewis also added allegations about a culture of discrimination in the Philadelphia District Attorney's Office, as demonstrated by the infamous McMahon juror selection training tape. The Pennsylvania Supreme Court concluded that Lewis's *Batson* claim was previously litigated on direct appeal and could not be revisited. *Lewis II*, 743 A.2d at 908. Lewis presented the same *Batson* arguments to the District Court, which reviewed the claim under the deferential standard of § 2254(d) and concluded that the Pennsylvania Supreme Court's adjudication of the issue on direct appeal was not an unreasonable application of *Batson*. *Lewis*, 2006 WL 2338409, at *13. The District Court also rejected Lewis's request for an evidentiary

hearing on his *Batson* claim, reasoning that Lewis failed in the state courts to develop the factual record necessary to support his claim. *Id.* at *14.

Lewis now argues that the District Court erred by applying § 2254(d) and that de novo review is appropriate because the *Batson* claim that he raised on direct appeal is not the same *Batson* claim as he raised in the PCRA and federal habeas proceedings, and, therefore, the refusal of the state courts to reach the issue did not constitute an adjudication on the merits of the instant claim to which the District Court and this Court owe deference.[4] While we do not find particularly persuasive Lewis's argument that the various iterations of his *Batson* claim actually constituted two distinct claims, we need not resolve whether the Pennsylvania Supreme Court's decision on direct appeal is entitled to AEDPA deference because we conclude that, even if we exercise de novo review, his claim fails for several reasons.

The first shortcoming with respect to this claim is the absence of a timely objection to the prosecutor's exercise of peremptory strikes during jury selection. Although *Batson* was not decided until after Lewis's trial and during the pendency of his direct appeal, Lewis did not make any objections to the prosecutor's use of peremptory challenges under the then-prevailing standard of *Swain v. Alabama,* 380 U.S. 202, 223–24, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). As the Supreme Court explained, an objection to the jury selection

---

4. Additionally, Lewis contends that the Pennsylvania Supreme Court's conclusion during the PCRA appeal that the previous litigation rule barred reconsideration of the *Batson* claim is not an independent and adequate ground to foreclose review in federal court at this time. We agree. At the time when Lewis's *Batson* claim was first litigated—during his direct appeal—the Pennsylvania Supreme

Court had a practice of reaching the merits of claims in capital cases, despite the existence of procedural defects. *See Banks v. Horn,* 126 F.3d 206, 212–14 (3d Cir.1997). Therefore, the fact that Lewis's claim may have been previously litigated in his first appeal is an inadequate state procedural rule that does not bar our review of the claim at this time.

process under *Swain* "necessarily states an equal protection violation subject to proof under the *Batson* standard," *Ford v. Georgia,* 498 U.S. 411, 420, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), and therefore serves to preserve such a claim for further review. Because *Batson* relies on trial judges "to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination," 476 U.S. at 97, 106 S.Ct. 1712, we have held that a timely objection is a prerequisite to raising a *Batson* claim. *Abu–Jamal v. Horn,* 520 F.3d 272, 284 (3d Cir.2008); *see Allen v. Lee,* 366 F.3d 319, 327–28 (4th Cir.2004) (en banc); *Thomas v. Moore,* 866 F.2d 803, 804 (5th Cir.1989). In *Abu–Jamal,* we explained that

> "[e]ven before *Batson,* a timely objection of racial bias involving jury composition would have alerted the judge to errors that might be corrected in the first instance and given the judge the opportunity to develop a complete record of the jury selection process for appellate review."

520 F.3d at 282. Therefore, we concluded that the existence of a timely objection to the use of peremptory strikes is not merely a matter of state procedural law; instead, "a timely objection is required to preserve" a claimed *Batson* violation for appeal and failing to do so will result in forfeiture of the claim.[5] *Id.* at 284.

■ Lewis contends that his pro se comments during jury selection were sufficient to preserve his *Batson* claim. In the course of voir dire, Lewis spoke out in response to the prosecutor's use of peremptory strikes on two occasions, at one point stating, "So prejudiced. So prejudiced," and at another point stating, "I knew he would do that." (App. 217, 439.) Because one of the primary reasons for requiring a timely objection to the exercise of peremptory strikes is to alert the trial judge to the purported misconduct and to allow the trial judge to remedy the discrimination, we must assess whether either or both of Lewis's comments should have put the trial judge on notice of the alleged racially discriminatory use of peremptory challenges. The statement "I knew he would do that" carries with it so many neutral and even benign implications that it is too ambiguous of an utterance to expect that it would alert the trial judge to an allegation of racial discrimination. On the contrary, the statement "So prejudiced. So prejudiced" is not subject to the same neutral or harmless interpretation. Yet even though it is accusatory, this single remark, uttered by Lewis himself, and not his counsel, provided insufficient notice to the trial judge of a claim that the prosecution was striking venire members in a racially discriminatory manner.

■ Nonetheless, even assuming Lewis properly preserved this claim, he has failed to establish a prima facie showing of a *Batson* violation. *Batson* claims are analyzed under a three-part burden shifting framework:

---

**5.** The procedural posture of Abu–Jamal's *Batson* claim is similar to that of Lewis's claim. Although Abu–Jamal, like Lewis, was convicted prior to the Supreme Court's decision in *Batson,* his direct appeal was still pending when the Supreme Court decided *Batson,* and therefore *Batson* applied retroactively to his case. *See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Moreover, similarly to Lewis, "Abu–Jamal did not object to the prosecutor's use of peremptory challenges at any point during *voir dire* or at his 1982 trial. Abu–Jamal first raised the argument that the prosecutor used peremptory strikes in a racially discriminatory manner on direct appeal to the Pennsylvania Supreme Court, which issued its opinion in 1989." 520 F.3d at 283–84 (footnote omitted).

"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, ... the trial court must determine whether the defendant has shown purposeful discrimination." *Miller–El v. Cockrell,* 537 U.S. 322, 328–29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (citations omitted). "A prima facie case will be found if, after considering the[ ] facts and all relevant circumstances, the 'evidence [is] sufficient to permit the trial judge to draw an inference that discrimination has occurred' in the prosecutor's exercise of peremptory challenges." *Abu–Jamal,* 520 F.3d at 288 (quoting *Johnson v. California,* 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)). In *Batson,* the Supreme Court identified "a 'pattern' of strikes against black jurors included in the particular venire" and "the prosecutor's questions and statements during voir dire examination and in exercising his challenges" as two of the "relevant circumstances" courts may consider in deciding whether a defendant has established a prima facie case of racial discrimination, 476 U.S. at 96–97, 106 S.Ct. 1712, and we have identified several additional relevant factors, including " 'how many members of the cognizable racial group are in the venire panel; the nature of the crime; and the race of the defendant and the victim.' " *Abu–Jamal,* 520 F.3d at 288 n. 16 (alterations omitted) (quoting *United States v. Clemons,* 843 F.2d 741, 748 (3d Cir.1988)); *see Simmons v. Beyer,* 44 F.3d 1160, 1167 (3d Cir.1995) (listing the relevant factors at the first step of the Batson analysis as "(1) the number of racial group members in the panel, (2) the nature of the crime, (3) the race of the defendant and the victim, (4) a pattern of strikes against racial group members, and (5) the prosecution's questions and statements during the voir dire").

In *Abu–Jamal,* we emphasized the importance (although not necessity) of supplying information about the strike rate and the exclusion rate in order to demonstrate a prima facie violation of *Batson,* noting that "[t]he Supreme Court has found prima facie *Batson* cases based on a pattern of discrimination, but only where the trial record has indicated both the strike rate and the racial composition of the venire." [6] *Abu–Jamal,* 520 F.3d at 290. Despite the fact that the record revealed that "the prosecution used ten peremptory strikes to remove black venirepersons from the petit jury out of a total of fifteen peremptory strikes exercised, resulting in a strike rate of 66.67%," we were unable to conclude that Abu–Jamal had demonstrated a prima facie case of racial discrimination in the absence of "evidence from which to determine the racial composition or total number of the entire venire"—information that "would permit the computation of the exclusion rate and would provide important contextual markers to evaluate the strike rate." *Id.* at 291–92.

■ The evidence in support of a prima facie violation of *Batson* is weaker in the present case than it was in *Abu–Jamal.*

---

6. In *Abu–Jamal,* we explained the difference between the strike rate and the exclusion rate: "The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove ... potential jurors [of the defendant's race] with the prosecutor's total number of peremptory strikes exercised," whereas the "exclusion rate ... is calculated by comparing the percentage of exercised challenges used against ... potential jurors [of the defendant's race] with the percentage of ... potential jurors [of the defendant's race] known to be in the venire." 520 F.3d at 290.

Here, Lewis alleges that the prosecutor exercised eight peremptory strikes against African American potential jurors and four against white potential jurors, and that Lewis was tried and convicted by an all-white jury. However, Lewis does not cite to any record support, nor does he offer other support outside the record, to substantiate this bare allegation, and therefore we cannot rely on this information to evaluate whether he has demonstrated a prima facie *Batson* violation. *See id.* at 292 n. 18. Additionally, Lewis acknowledges that the racial composition of the entire venire remains unknown and instead posits that "the venire likely was statistically similar to the overall population of Philadelphia." Without information about the number and racial composition of the entire venire, we cannot calculate the exclusion rate and we lack the "contextual markers" to analyze the significance of the strike rate. Thus, even if we were to accept as true Lewis's bald assertion that eight of the twelve venire members whom the prosecutor struck were African American, a strike rate of 66.67% is insufficient information to establish a prima facie case of racial discrimination in the exercise of peremptory strikes. *See id.* at 293 ("As noted, here the prosecution used ten of fifteen peremptory strikes against black potential jurors. We have never found a prima facie case based on similar facts.").

In an attempt to bolster his claim, Lewis points to the McMahon training tape, created in 1987 and featuring Assistant District Attorney Jack McMahon, as evidence that a culture of discrimination existed throughout the Philadelphia District Attorney's Office at the time Lewis was prosecuted. Although many of the practices advocated in the McMahon tape flout the principles outlined in *Batson,* the tape was created four years after Lewis's trial and fails to provide any information about the routine practices of the particular prosecutor in Lewis's case or the practices actually utilized at Lewis's trial. This type of general information, while not inconsequential, will not do as a substitute for the concrete, case specific information that is necessary to demonstrate a prima facie *Batson* violation.

Thus, the only reliable information we have to assess this claim is evidence of the fact that Lewis is African American and that the victim, Ellis, was African American. This does not support an inference that the crime was racially motivated, nor is there any indication that the crime was racially charged. Moreover, there is no evidence of the racial composition of the venire, and there is nothing more than unsupported allegations about the racial composition of the empaneled jury and the race of the venire members whom the prosecution excluded with its peremptory strikes. As a result, we simply cannot conclude that Lewis has met his burden, at the first step of *Batson,* "to develop a record sufficient to establish a pattern of discrimination that gives rise to an inference of discrimination." *See id.* at 291. Because we do not find Lewis's *Batson* claim meritorious, we also reject his argument that his appellate counsel was ineffective for failing to make an adequate proffer in support of his *Batson* claim on direct appeal. Lastly, we deny Lewis's request for an evidentiary hearing on this claim for similar reasons as explained by the District Court; that is, we conclude that he has failed at every stage of his state court proceedings to develop the factual basis necessary to support this claim.[7]

---

7. Despite Lewis's repeated requests for an evidentiary hearing, he failed to make any

efforts to provide reliable evidence in support of his *Batson* claim, such as by providing

28 U.S.C. § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that (A) the claim relies on ... (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence"); *see Michael Williams v. Taylor,* 529 U.S. 420, 435, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (explaining that the purpose of § 2254(e)(2) is "to ensure the prisoner undertakes his own diligent search for evidence"); *Taylor v. Horn,* 504 F.3d 416, 437 (3d Cir.2007) (" 'Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.' " (quoting *Michael Williams,* 529 U.S. at 437, 120 S.Ct. 1479)).

## B. Ineffective Assistance of Counsel at the Guilt Phase Claim

Lewis argues that he is entitled to relief from his conviction because his trial counsel rendered ineffective assistance by failing to properly investigate and present his alibi defense and by not presenting a theory of self defense. More specifically, Lewis contends that his trial counsel failed to investigate documentary evidence—namely bus tickets—which supported his alibi defense, failed to contact and secure the attendance of certain alibi witnesses, and failed to properly prepare the alibi witnesses who did testify. Lewis asserts that he was prejudiced by his counsel's lack of preparation because the presentation of a weak alibi defense suggested consciousness of guilt and bolstered the Commonwealth's case.

Lewis raised this ineffectiveness claim for the first time before the Pennsylvania Supreme Court on appeal from the denial of his PCRA petition. The Pennsylvania Supreme Court determined that this claim was waived because "[t]he version of the PCRA in effect at the time [Lewis] filed the instant petition provided that an issue is waived 'if it could have been raised ... in a prior proceeding,' " *Lewis II,* 743 A.2d at 909 (quoting 42 Pa. Cons.Stat. Ann. § 9544(b)). It also explained that this particular claim was "not raised before the PCRA court in [Lewis's] PCRA petition or any amendments nor in [Lewis's] Objection to the PCRA court's notice of intent to dismiss," *id.* at 909 n. 2, and the doctrine of " 'relaxed waiver' does not apply to claims made in capital PCRA petitions." *Id.* at 909.

▮▮▮▮ Although the Pennsylvania Supreme Court declined to reach the merits of Lewis's claim on grounds that it was waived, we cannot conclude that this decision was based on an independent and adequate state procedural rule such that it would bar our review of the claim. Federal habeas courts " 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " *Lambrix v. Singletary,* 520 U.S. 518, 522, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). A state procedural rule is adequate if it was "firmly established and regularly followed" at the time of the alleged procedural default. *Ford,* 498 U.S. at 424, 111 S.Ct. 850. To be

---

affidavits of the stricken venire members attesting to their race, obtaining voter registration cards identifying the stricken venire members' race, or submitting exhibits of Lewis's notes from jury selection, the notes of his counsel, or the notes of the prosecutor. Because Lewis has not availed himself of these means of substantiating his allegations, we fail to see how an evidentiary hearing would be beneficial.

considered firmly established and regularly followed, "(1) the state procedural rule [must] speak[ ] in unmistakable terms; (2) all state appellate courts [must have] refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance [must be] consistent with other decisions." *Doctor v. Walters,* 96 F.3d 675, 683–84 (3d Cir.1996).

In 1998, the Pennsylvania Supreme Court announced that it would no longer "decline to apply ordinary waiver principles ... in PCRA appeals." *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998). But for two decades prior to this decision, the Pennsylvania Supreme Court maintained a "practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural criteria." *Banks v. Horn,* 126 F.3d 206, 214 (3d Cir.1997). Therefore, notwithstanding the fact that the Pennsylvania Supreme Court ruled on Lewis's PCRA appeal after its decision in *Albrecht,* for purposes of determining whether there is a procedural bar to our review of Lewis's claim, we must look to the time at which his procedural default supposedly occurred. *See Doctor,* 96 F.3d at 684 (explaining that the relevant time for determining whether a rule was firmly established and regularly applied is not when the state court relied on it, "but rather ... the date of the waiver that allegedly occurred"). Although Lewis had the opportunity to raise his claim of ineffective assistance of counsel in his PCRA petition, the petition was filed in 1995 (and amended in

1996) at a time when the Pennsylvania Supreme Court still applied the doctrine of relaxed waiver to PCRA appeals in capital cases.[8] Therefore, the Pennsylvania Supreme Court's refusal to reach Lewis's ineffective assistance of counsel claim because of his failure to raise it in his PCRA petition does not bar our review as it was not an independent and adequate procedural rule.

 Because the Pennsylvania courts did not reach the merits of Lewis's claim of ineffective assistance of counsel at the guilt phase of his trial, we review this claim de novo. The test for ineffective assistance of counsel contains two components:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To establish deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. In analyzing this first prong of the Strickland test, there is a strong presumption that counsel performed reasonably. *Id.* at 689, 104 S.Ct. 2052. To establish prejudice, the defendant "must show that

---

**8.** The District Court also concluded that at the time of Lewis's purported procedural default, the Pennsylvania Supreme Court utilized the doctrine of relaxed waiver to review all capital claims. *See Lewis,* 2006 WL 2338409, at *4. However, the District Court considered 1984 to be the relevant time for assessing the adequacy of Pennsylvania's waiver rules because this was the year in which Lewis filed his direct appeal. *See id.* Because the Pennsylvania Supreme Court focused on Lewis's failure to raise his ineffective assistance claim in his PCRA petition or any subsequent amendments to the petition, we consider this to be the relevant time for assessing Lewis's waiver.

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Under this standard, we are unable to conclude that the conduct of Lewis's counsel was objectively unreasonable, and even if it were, we would be unable to conclude that the result of Lewis's trial would have been different but for his counsel's error.

■ None of Lewis's arguments persuade us that he has overcome the presumption that his counsel performed reasonably. Despite Lewis's complaint that his trial counsel did not sufficiently prepare his alibi witnesses, the record indicates otherwise. In the middle of trial, Lewis's counsel discussed with the court the difficulties he was having in presenting the alibi defense. (App. at 1163.) He mentioned that he had $2,500 to bring witnesses in from California but he wanted to make sure the witnesses would be beneficial and have material testimony before they came to court. He also stated that he had only received the address for Lewis's brother, Michael, a week before and that he was having difficulty contacting him, adding that the phone number for Michael's wife had been disconnected. Lewis's counsel suggested that he could not go forward with the defense until he reached Michael Lewis. (App. at 1164–65.) The prosecutor commented that based on his investigator's discussions with Michael Lewis and his wife, they appeared reluctant to come to Philadelphia and serve as alibi witnesses. (App. at 1166–67.)

Despite these difficulties, Lewis's counsel was able to present Michael Lewis as an alibi witness. Michael's testimony—that he met Lewis at the Trailways bus station in California on November 19—was uncomplicated and therefore undermines Lewis's argument that he was inadequately prepared. (App. at 1425.) Similarly, although Clarence Edwards stated that the first time he was contacted to be an alibi witness was the day before he testified at the trial, he also stated that Lewis's trial counsel was trying to get in touch with him, (App. at 1307–08), and his testimony—that Lewis asked for a ride to the Trailways bus station around November 14—was straightforward as well. (App. at 1285–88.) As for Lewis's contention that his counsel's failure to recognize his fiancée, Stephanie McCorey, when she entered the courtroom in violation of a sequestration order caused him to lose a crucial witness, McCorey admitted that she did not know anything about the case and that, upon entering the courtroom, she told a court officer that she was not a witness. (App. at 1090, 1094.) Lewis's counsel stated that he had met with McCorey for a few minutes the previous week and that he had listed her as a possible witness only because Lewis had given him her name. (App. at 1090, 1094.) Additionally, Lewis has not offered any affidavit from McCorey as to what testimony she could have provided at trial.[9] Likewise, with respect to potential alibi witnesses who did not testify, Lewis has not presented any affidavits describing what those witnesses would have testified about.

■ For all of these reasons, we cannot agree with Lewis that his trial counsel's investigation and presentation of the

---

9. Although Lewis asserts that McCorey's testimony was important to show that the Commonwealth destroyed evidence of his bus tickets to California, we reject this argument—as well as the argument that trial counsel was ineffective for not requesting the bus tickets from the Commonwealth—for reasons explained in Part III.C.

alibi defense was objectively unreasonable. Moreover, even if we were to conclude that his counsel's performance was deficient, in light of the overwhelming evidence against him—including six eyewitnesses who knew Lewis and identified him as the assailant and the eyeglasses left at the crime scene which resembled ones that Lewis had been photographed wearing—we would not be able to conclude that there is a reasonable probability that the outcome of Lewis's trial would have been different in the absence of his counsel's errors.

■ Nor can we conclude that Lewis has demonstrated that his counsel performed unreasonably by failing to present a theory of self defense in addition to, or instead of, the alibi defense. As Lewis emphasizes elsewhere in his appeal, he has, from the time of his arrest, relied upon an alibi, and he has not provided any indication that he would have allowed his counsel to present a theory of self defense.[10] Instead, Lewis's statements during pre-trial hearings reveal an insistence on maintaining an alibi defense and, as the District Court noted, it would have been factually inconsistent to present a theory of self defense in the alternative. Moreover, the testimony of the only witness who observed the entire altercation between Lewis and Ellis would have directly contradicted a theory of self defense. (App.1113.) Therefore, Lewis has not overcome the presumption that his counsel's decision not to present a theory of self defense was a strategically reasonable one, and we reject his arguments to the contrary.

### C. *Brady* Claim

Lewis argues that he is entitled to relief from his conviction because the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215

(1963), by suppressing evidence of a bus ticket from Philadelphia to San Diego, contained in a briefcase he was carrying at the time of his arrest, that he alleges supported his alibi defense. Lewis contends that the Pennsylvania Supreme Court, on PCRA review, unreasonably determined the facts relevant to this claim by crediting the testimony of Detective Kane, the arresting officer, that the Greyhound bus ticket contained in Lewis's briefcase did not indicate the date, origin, or destination of travel and that the briefcase as well as its contents were turned over to Lewis's fiancée. Lewis maintains that the briefcase contained stubs of his bus tickets from his trip to San Diego, which would have placed him outside of Philadelphia on the night of the murder. He contends that Detective Kane took "active" steps to conceal the tickets by failing to inventory the briefcase, preserve the tickets, or disclose them to the defense.

■ In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has outlined a three-part test to determine if a *Brady* violation has occurred: " 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)); *see Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir.2004).

---

**10.** Similarly, there is no statement from Lewis that his counsel failed to investigate or discuss with him a possible theory of self defense.

■ Because Lewis's *Brady* claim was adjudicated on the merits in state court during his PCRA proceedings, we review it under the deferential standard set forth in § 2254(d). In doing so, we cannot conclude that the Pennsylvania Supreme Court's decision "involved an unreasonable application" of *Brady* or "was based on an unreasonable determination of the facts." The Pennsylvania Supreme Court determined that the evidence did not support Lewis's claim because the bus ticket would not have corroborated his alibi defense and the ticket was not seized by the police. It noted that Lewis testified "that he took a Trailways bus to San Diego and a Greyhound bus for the return trip to Philadelphia" and that Detective Kane testified "that he only recalled seeing a Greyhound ticket in the briefcase and specifically recalled seeing the Greyhound logo on the ticket." *Lewis II*, 743 A.2d at 910–11. Moreover, the Pennsylvania Supreme Court observed that, according to Detective Kane's testimony, the Greyhound ticket "did not contain any information regarding date of travel or the point of origin of the travel," and that "[t]he ticket, along with the briefcase and its other contents, was transported with [Lewis] to prison on the day of his arrest and later turned over to [Lewis's] fiancée." *Id.* at 911. Consequently, the Pennsylvania Supreme Court concluded that "[t]here can be no *Brady* violation where the prosecution did not have custody of the ticket and where it would not have provided exculpatory evidence." *Id.* Although Lewis challenges Detective Kane's credibility, he has not proffered clear and convincing evidence to overcome the presumption of correctness that attaches to the state court's factual determinations. *See* § 2254(e)(1). For these reasons, we must reject Lewis's arguments and conclude that he is not entitled to relief on the basis of this claim.[11]

## D. Ineffective Assistance of Counsel at the Penalty Phase Claim

In its cross-appeal, the Commonwealth argues that the District Court erred in granting Lewis sentencing relief based on his claim that his counsel rendered ineffective assistance at the penalty phase of his trial by failing to investigate and present mitigating evidence. The Commonwealth argues that the District Court failed to afford deference to the Pennsylvania Supreme Court's reasonable factual findings, instead substituting its own view of the evidence, and that the District Court failed to apply the presumption that counsel performed in a professionally reasonable manner. The Commonwealth also argues that the District Court improperly evaluated the prejudice prong of this claim under a de novo standard of review rather than applying AEDPA's deferential standard. We will address each of these arguments in turn.

### 1. Deference to State Court Factual Determinations

Lewis first challenged his counsel's effectiveness at the penalty phase of his trial

---

11. Lewis is not entitled to an evidentiary hearing on either his ineffective assistance at the guilt phase claim or his *Brady* claim because he failed to develop the factual bases for these claims in his state court proceedings. *See* § 2254(e)(2). Moreover, even if § 2254(e)(2) did not prohibit an evidentiary hearing on these claims, we would still conclude that a hearing would be inappropriate because Lewis would not be able to establish the facts needed to demonstrate that relief should be granted on either claim. *See Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

during his PCRA proceedings. The PCRA court denied relief on this claim and, on appeal from that decision, the Pennsylvania Supreme Court addressed and rejected the claim on its merits. *See Lewis II*, 743 A.2d at 909–10. Therefore, under these circumstances, the role of a federal habeas court is to review the state court's disposition through the lens of § 2254. Although the District Court recognized as much when it stated that "the Pennsylvania Supreme Court reached the merits of this claim" and it was thus obligated to "apply AEDPA's deferential standard of review," *Lewis*, 2006 WL 2338409, at *5 n. 6, the District Court nonetheless went on to determine the facts for itself and, in doing so, failed to give appropriate deference to the state court's decision.

In *Lewis II*, the Pennsylvania Supreme Court determined that the record did *not* support Lewis's claim that he suffered from serious mental illness and brain damage. 743 A.2d at 909. The Pennsylvania Supreme Court provided the following analysis of this claim:

"In his PCRA petition, appellant contended that his trial counsel was ineffective for failing to investigate, discover and present evidence at the penalty phase of appellant's trial that appellant was mentally ill. In support of this claim, appellant offered affidavits from a psychiatrist who examined him nearly fifteen years after the murder and concluded that he suffered from brain damage and mental illness at the time of the murder and from family members claiming that appellant was 'different' as a child and that he suffered abuse at the hands of his father. Negating appellant's claim, however, is the presentencing mental health evaluation conducted on August 18, 1983, less than one year after the murder, in which the evaluator found that appellant did not manifest any major mental illness that could be a factor in the disposition of his case and that appellant appeared to be competent for sentencing.

Appellant's claim that he suffers from brain damage or serious mental illness is also simply not supported by the record. Appellant played a very active role in his trial and in pre-trial proceedings. At a conference before the court on May 19, 1983, at which appellant's then-appointed counsel sought leave to withdraw, appellant stated that he was 'legally astute and legally competent to represent' himself. N.T. 5/19/83 at 6. Throughout the conference, he spoke in a coherent and cogent manner, displaying a good command of language and vocabulary as well as knowledge of the legal process and his constitutional rights. *Id.* at 6–16. Further, appellant testified at a suppression hearing on July 27, 1983, where he also demonstrated clarity of thought and intelligence. N.T. 7/27/83 at 182–220. Appellant also testified at length at his trial regarding his alibi defense, once again showing no signs of brain damage or mental illness but rather appearing intelligent and well-spoken. N.T. 8/10/83 at 1054–1113. Because appellant gave no indication at the time of his trial that he suffered from brain damage or serious mental illness, his trial counsel and subsequent appellate counsel cannot be ineffective for failing to investigate, discover and present evidence of such brain damage or mental illness."

*Id.* at 909–10 (footnote omitted). As this passage makes clear, the Pennsylvania Supreme Court evaluated the evidence that Lewis presented in support of his claim that counsel was ineffective at the penalty phase of trial and compared it to the record as a whole in the course of determining that Lewis had not demonstrated that at the time of his trial he was suffering

from brain damage or mental illness. However, when the District Court analyzed this claim, it stated that "[t]he evidence that [Lewis] has presented, both in the PCRA courts and in his habeas proceedings, reveals that he does in fact suffer from a host of mental health issues, many of which may be attributable to his deeply troubled family background." *Lewis*, 2006 WL 2338409, at *6. The District Court reached this conclusion without mentioning the Pennsylvania Supreme Court's finding to the contrary.

 Under AEDPA, factual determinations made by state courts—such as the one at issue here—are entitled to deference:

> "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

§ 2254(e)(1).[12] This presumption of correctness applies to factual determinations of both state trial and appellate courts. *See Rolan v. Vaughn*, 445 F.3d 671, 679 (3d Cir.2006); *Duncan*, 256 F.3d at ·196. Implicit factual findings are entitled to § 2254(e)(1)'s presumption of correctness as well. *Campbell v. Vaughn*, 209 F.3d 280, 285–86 (3d Cir.2000). Additionally, while § 2254 does not condition deference to state court factual findings on whether the state court held a hearing, *Fahy*, 516 F.3d at 182, the procedures used in the state court's adjudication of a claim may impact whether the petitioner has rebutted the presumption of correctness, *see Lambert*, 387 F.3d at 239. Thus "state factfinding procedures may be relevant when deciding whether … a petitioner has adequately rebutted a fact, but the procedures are not relevant in assessing whether deference applies to those facts." *Rolan*, 445 F.3d at 679.

In light of this standard, the District Court was not free to determine anew the underlying facts of this claim; rather, the Pennsylvania Supreme Court's factual determination that Lewis had not demonstrated that he suffered from mental illness or brain damage was entitled to a presumption of correctness and the burden was on Lewis to rebut this presumption with clear and convincing evidence. Because the District Court did not address whether Lewis rebutted the presumption of correctness that attached to the state court's factual determinations, and instead arrived at its own interpretation of the facts without conducting an evidentiary hearing, we will engage in a plenary review of this issue. *See Slutzker v. Johnson*, 393 F.3d 373, 378 (3d Cir.2004) ("[O]ur review of the District Court's factual findings is … plenary, because [the District] Court relied solely on the state court record, and did not conduct an evidentiary hearing.").

---

12. Additionally, under § 2254(d)(2), relief cannot be granted on a claim that was adjudicated on the merits in state court proceedings unless the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." We have previously explained that " 'the language of § 2254(d)(2) and § 2254(e)(1) implies an important distinction: § 2254(d)(2)'s reasonableness determination turns on a consideration of the totality of the 'evidence presented in the state-court proceeding,' while

§ 2254(e)(1) contemplates a challenge to the state court's individual factual determinations, including a challenge based wholly or in part on evidence outside the state trial record.' " *Taylor v. Horn*, 504 F.3d at 429 (quoting *Lambert*, 387 F.3d at 235). Here, the District Court did not grant relief to Lewis on the basis that the Pennsylvania Supreme Court's decision resulted in an unreasonable determination of the facts but rather that the decision amounted to an unreasonable application of federal law to the facts of Lewis's case. *See Lewis*, 2006 WL 2338409, at *11.

Upon review of the evidence that Lewis provides in support of his claim that information was available to his trial counsel pertaining to his mental illness and brain damage, we cannot conclude that he has rebutted the presumption of correctness that attaches to the state court's factual determination. As even a brief summary of the mental health evaluations reveals, the evidence that Lewis relies on to establish his mental illness and brain damage is in large part contradictory. For example, in a psychiatric evaluation conducted shortly after trial in August 1983, Dr. Camiel reported that Lewis was more intelligent than previous testing had shown; that Lewis's "thoughts progressed in a normal associative manner without evidence of an underlying thought disorder or rambling pattern of speech"; and he diagnosed Lewis as having an Antisocial Personality Disorder, with his grandiose thoughts constituting a narcissistic component to his disorder. (App. at 2162–66.) Similarly, a psychiatric evaluation conducted by Dr. Canals in 1993 provided the following information: Lewis appeared to be very intelligent; "during the interview he did not show any symptoms of being psychotic, he appeared to be in good contact with reality, he was somewhat grandiose, admitted to episodes of feeling high without the use of chemicals and his conversation was well organized"; he had Polysubstance Abuse Severe, Explosive Disorder, Antisocial Personality Disorder, Paranoid Personality Disorder, and Hypomanic Personality Disorder; and Lewis was not suffering from any major mental illness. (App. at 2156–61.)

In contrast, a psychological evaluation conducted by Dr. Wellman in 1984 revealed that tests placed Lewis's IQ at 77, considered borderline mentally retarded; mentioned brain damage and a head injury inflicted by his father; and described Lewis's self-image as "inflated to the point of mild grandiosity," noting that those persons with this profile type often have paranoid mental activity and disordered thinking. (App. at 2168–69.) Likewise, Lewis was evaluated in 1997 by a forensic psychologist, Dr. Berland, who observed that a test put Lewis's IQ at 86, the bottom of the average range; testing indicated a serious psychotic disturbance involving delusional paranoid thinking, psychotic mood disturbance, and perceptual disturbance including hallucinations; testing suggested diffuse or widespread damage to Lewis's cerebral cortex, which may have been congenital; and Lewis suffered from brain damage and chronic, serious, mental illness. (App. at 2171–72, 2186.) In combination, this evidence is far from conclusive with respect to establishing that Lewis suffers from mental illness or brain damage.

In addition to these professional evaluations, Lewis offers declarations from various family members and friends in support of his claim that evidence of his mental illness and brain damage was available to his trial counsel. For example, Lewis's mother stated that she drank turpentine while pregnant with Lewis and that he had suffered a head injury as a young boy when his father slammed Lewis's head into the bathtub. (App.1968–70.) But Lewis himself has never acknowledged any abuse—he informed Dr. Canals that he was raised by "very good" parents who were "decent law-abiding citizens" and that he was never abused (App.2156)—nor has he submitted reports from any doctors specializing in neurological issues. Other evidentiary problems include that Lewis has not submitted medical records of psychiatric treatment from before or during his incarceration, he has not submitted any school records showing learning or emotional problems, and he has not addressed the possibility that his allegedly delusional

behavior was actually caused by his heavy drug use. Further undermining Lewis's attempt to show that he suffers from mental illness and brain damage is the affirmative evidence of his active and engaged conduct at trial and during pre-trial hearings. (App. at 739–772.) Therefore, at best, the evidence of record with respect to Lewis's mental health and brain damage is in conflict and we cannot conclude that Lewis rebutted, with clear and convincing evidence, the state court's factual determination that the record did not support his claim of mental illness or brain damage. Moreover, the District Court's mistake in disregarding the Pennsylvania Supreme Court's factual determinations in favor of its own infected the remainder of its analysis.

### 2. Reasonableness of Counsel's Performance

■■■ Based on its own determination of the underlying facts of this claim, the District Court concluded that "trial counsel failed to present any evidence whatsoever in mitigation [which] leads inexorably to the conclusion that he failed to make any reasonable effort to uncover such evidence," and "there can be no reason, strategic or otherwise for trial counsel's failure to investigate and present mitigating evidence." *Lewis*, 2006 WL 2338409, at *11. Thus the District Court concluded that the Pennsylvania Supreme Court unreasonably applied the Supreme Court's precedents in *Strickland* and *Terry Williams*. *Id.* However, in reaching these conclusions, the District Court failed to apply the presumption that Lewis's counsel performed in a professionally reasonable manner.

■■■■ To reiterate, in order to establish deficient performance, a "defendant must show that counsel's representation

fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. The courts, in turn, must make "every effort … to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. Therefore, in evaluating the first prong of the *Strickland* test, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* The presumption can be rebutted by showing "that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." *Thomas v. Varner*, 428 F.3d 491, 499–500 (3d Cir.2005) (footnote omitted). Consequently,

> "[i]n cases in which the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the presumption may only be rebutted through a showing that no sound strategy posited by the Commonwealth could have supported the conduct."

*Id.* at 500 (footnote omitted) (citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003), in which the Supreme Court explained that the presumption of reasonableness "has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive" (internal quotation marks omitted)).[13]

---

**13.** In contrast, where the government "can

show that counsel actually pursued an *in-*

Nonetheless, even if the presumption is rebutted, a court must still " 'determine whether, *in light of all the circumstances*, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance.' " *Jacobs v. Horn*, 395 F.3d 92, 106 (3d Cir.2005) (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052).

In his PCRA proceedings, Lewis framed his ineffective assistance argument as a challenge to his trial counsel's failure to conduct any "investigation geared toward the penalty hearing" and to present "information regarding [his] mental illness." The District Court was persuaded that there was "no reason, strategic or otherwise for trial counsel's failure to investigate and present mitigating evidence." *Lewis*, 2006 WL 2338409, at *11. However, as we have already discussed, the District Court did not apply the presumption of correctness to the Pennsylvania Supreme Court's finding that the record did not support Lewis's claim that, at the time of trial, he suffered from mental illness or brain damage. Thus, the District Court's statement that "no reason, strategic or otherwise" existed for trial counsel's "failure to ... present mitigating evidence" of Lewis's "mental health issues" is incorrect for at least two reasons.

First, if evidence of Lewis's mental illness and brain damage was lacking because he did not in fact suffer from either condition—as the Pennsylvania Supreme Court found—it cannot be said that "no reason" existed for failing to present such evidence. A valid reason for not presenting evidence is that it does not exist.[14]

Second, even if the state court's factual determination that Lewis had not established that he was suffering from mental illness or brain damage could be disregarded, it was error for the District Court not to employ the presumption that Lewis's counsel acted in a professionally reasonable manner. Instead of applying this presumption, the District Court jumped to the conclusion that counsel's failure to present mitigating evidence was unreasonable. However, under our caselaw, where, as here, the record is silent as to counsel's strategy or lack thereof, the defendant bears the burden of proving that no sound strategy offered by the Commonwealth would have supported the conduct. *See Varner*, 428 F.3d at 500. Because the District Court did not engage in this analysis, we consider it best not to do so in the first instance at this time.

In addition to Lewis's claim that his counsel was ineffective for failing to present evidence of his mental illness and brain damage, Lewis also premised his ineffective assistance claim on grounds that his counsel failed to conduct any investigation in preparation for the penalty phase of his trial. While counsel's failure to present mitigating evidence of Lewis's mental health may have come within the wide range of reasonable professional assistance—either because the evidence to support this claim did not exist or a sound strategy supported the decision not to present the evidence—we must still determine whether counsel's efforts to investigate any mitigating evidence were reasonable. In *Strickland*, the Supreme Court instructed that "counsel has a duty to

*formed* strategy (one decided upon after a thorough investigation of the relevant law and facts)," *Varner*, 428 F.3d at 500, the initial presumption that counsel performed reasonably becomes "virtually unchallengeable," *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

14. Of course, this is different than saying that such evidence existed but counsel was merely unaware of it or failed to discover it. We discuss the reasonableness of trial counsel's investigation into mitigating evidence separately.

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and therefore, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691, 104 S.Ct. 2052. The Supreme Court further explained that "what investigation decisions are reasonable depends critically on" information supplied by the defendant, noting that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* To this end, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Id.*

Accordingly, before we can assess the reasonableness of counsel's investigatory efforts, we must first determine the nature and extent of the investigation that took place as well as the nature and extent of the communications that occurred between Lewis and his counsel on this issue. This task is made difficult by the fact that Lewis's trial counsel is deceased, having died shortly after the conclusion of Lewis's trial, and Lewis himself has not offered any statements on his own behalf. On this record, Lewis has not established that his counsel in fact failed to undertake any investigation of his family background or failed to consult with him regarding the decision to investigate. Although Lewis offers declarations from his mother and siblings that they were not contacted by Lewis's trial counsel, as the Commonwealth points out, these were unsworn statements not tested by the adversary method, and were offered, in large part,

by witnesses who testified at trial in support of Lewis's alibi defense and whose testimony the jury discredited. This is hardly a sufficient basis upon which to conclude that Lewis's counsel conducted no background investigation and that counsel's conduct was not reasonable under all of the circumstances. Moreover, we are unwilling to conclude, as the District Court did, that "[t]he fact that trial counsel failed to present any evidence whatsoever in mitigation leads inexorably to the conclusion that he failed to make any reasonable effort to uncover such evidence." *Lewis*, 2006 WL 2338409, at * 11. The record on this issue is too undeveloped for us to conclude that Lewis's counsel failed to conduct any background investigation and did not act in a professionally reasonable manner in this regard. *Cf. Thomas v. Horn*, 570 F.3d at 125 (noting that it would be "premature" to decide if counsel's performance was deficient without first conducting an evidentiary hearing to determine "the extent, if any, of [the defendant's] counsel's pre-sentencing investigative efforts to obtain mitigating evidence," notwithstanding the fact that the defendant's relative provided a signed statement that she had not been contacted about the defendant's life and mental health and there was no affirmative evidence of an investigation); *Marshall v. Hendricks*, 307 F.3d 36, 106 (3d Cir.2002) (remanding to the district court to conduct an evidentiary hearing before reevaluating whether counsel's performance was deficient where there was "no record before us as to what preparation or investigation, if any, was performed by counsel in anticipation of the penalty phase").

In sum, that counsel did not present evidence relating to Lewis's mental health or his family background does not compel the conclusion that counsel failed to con-

duct any investigation into mitigating evidence, as the District Court reasoned, and thereby failed to act in a professionally reasonable manner. When deference is afforded to the state court's underlying factual determinations and when the presumption that counsel performed adequately is given effect, we cannot conclude that the Pennsylvania Supreme Court unreasonably applied Supreme Court precedent · in denying relief to Lewis on the basis of his ineffective assistance claim.

### 3. Prejudice Resulting From Deficient Performance

■ Because we disagree with the District Court's analysis of the performance prong of *Strickland,* and this error alone requires us to reverse the District Court's grant of relief from Lewis's sentence, we do not need to provide an exhaustive analysis of the prejudice prong at this time; however, we will make two observations before moving on. First, the District Court incorrectly determined that de novo review was appropriate. As we have previously noted, "the Supreme Court clearly held that the § 2254(d) standards apply when a state supreme court rejects· a claim without giving any indication of how it reached its decision." *Chadwick v. Janecka,* 312 F.3d 597, 606 (3d Cir.2002) (internal quotation marks omitted). Thus, federal habeas courts must distinguish between the denial of a claim without explanation and the failure to adjudicate a claim on its merits; only the former triggers the application of AEDPA's deferential standard of review. Here, the Pennsylvania Supreme Court's decision can be interpreted as concluding that Lewis was not prejudiced by his counsel's conduct just as easily as it can be interpreted as concluding that his counsel's conduct was not unreasonable. Therefore, the District Court erred by not

applying § 2254(d) to this aspect of Lewis's ineffective assistance claim.

Second, if it becomes necessary to reconsider whether Lewis was prejudiced by any deficiencies in his counsel's performance, the District Court will need to engage in a meaningful reweighing of the aggravating and mitigating evidence in order to decide this issue. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."); *see also Marshall,* 307 F.3d at 103 ("Given the unanimity requirement, the 'reasonable probability of a different outcome' would mean that only one juror need weigh the factors differently and find that the aggravating factor did not outweigh" the mitigating factors). Also relevant to the prejudice analysis is the issue of whether Lewis would have allowed trial counsel to present disparaging and negative information to show that he was mentally ill, brain damaged, and abused, especially in light of his desire to portray himself as a person of "superior intellect" and his attempts to control the presentation of his case. (Supp.App. 6–7, 9, 11–18; Tr. 6/16/83 at 12, 14–15; App. at 732–35.) Lewis has yet to provide any statement that the decision not to present background information in mitigation was other than his own choice. *See Schriro v. Landrigan,* 550 U.S. 465, 478, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (addressing "a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court" and deferring to the state court's conclusion that prejudice could not be shown); *Taylor v. Horn,* 504 F.3d at 455 (reasoning that "whatever counsel could have uncovered, [the defendant] would not have permitted any witnesses to testify, and was

therefore not prejudiced by any inadequacy in counsel's investigation or decision not to present mitigation evidence"); *cf. Thomas v. Horn,* 570 F.3d at 123 ("At no time did my attorney explain to me that evidence concerning my character could or should be presented for the jury's consideration at the penalty hearing.").

### 4. Developing Support for this Claim in an Evidentiary Hearing

■ Notwithstanding our conclusions that Lewis has failed to demonstrate that he is entitled to sentencing relief on his ineffective assistance of counsel claim, we believe that Lewis should be granted an evidentiary hearing to try to develop the record in support of his claim. Section 2254(e)(2) provides that if an applicant "has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim," unless one of the enumerated exceptions applies. The focus of this inquiry is on whether the defendant was diligent in his efforts to provide the factual bases for his claim during the state court proceedings. *See Michael Williams,* 529 U.S. at 435, 120 S.Ct. 1479 ("Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court...."). Through each stage of his PCRA proceedings, Lewis continued to supplement his claim with additional factual support. While this piecemeal development of the factual basis of a claim is not ideal, we conclude, on these facts, that it suffices to meet the standard set forth in § 2254(e)(2). Therefore, we will remand to the District Court to conduct an evidentiary hearing, which provides Lewis with the opportunity to rebut the presumption of correctness that applies to the Pennsylvania Supreme Court's determination that

Lewis did not demonstrate that he suffers from serious mental illness or brain damage and to rebut the presumption that his counsel's performance was professionally reasonable by showing that no sound strategy posited by the Commonwealth would support his counsel's decisions regarding the investigation and presentation of mitigating evidence and that the totality of the circumstances establish that his counsel's conduct was unreasonable. The burden is on Lewis to overcome these presumptions, which we expect will be difficult to do if Lewis continues to remain silent. Additionally, the District Court will need to determine the credibility of Lewis's witnesses, rather than simply relying on unsworn statements, and the Commonwealth will have the opportunity to present its own evidence as well. If necessary, after the record is more fully developed, the District Court will need to reweigh the mitigating and aggravating evidence in its entirety in the course of determining if Lewis was prejudiced by any deficiencies in his counsel's performance.

Lastly, we note that both the Pennsylvania Supreme Court and the District Court considered whether Lewis was able to establish his ineffective assistance claim based on his counsel's failure to present available evidence of his mental health issues. This is understandable in light of the way Lewis framed his claim and his evidence in support of the claim. Nonetheless, Lewis's claim could also be interpreted to encompass a challenge to his counsel's failure to present background information that may have been independently mitigating, even if it did not demonstrate that Lewis suffers from serious mental illness or brain damage. Under Pennsylvania's statute, in addition to several specifically enumerated mitigating circumstances, a defendant may present "[a]ny other evidence of mitigation con-

118

cerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Cons.Stat. Ann. § 9711(e)(8); *cf. Terry Williams,* 529 U.S. at 395–96, 120 S.Ct. 1495 (concluding that "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background" where they failed to uncover and present "extensive records graphically describing [the defendant's] nightmarish childhood," including information that the defendant's "parents had been imprisoned for the criminal neglect of [the defendant] and his siblings, and that [the defendant] had been severely and repeatedly beaten by his father"); *see also Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable ... to emotional and mental problems, may be less culpable than defendants who have no such excuse" (internal quotation marks omitted)). Because the Pennsylvania Supreme Court did not consider whether Lewis's counsel may have been ineffective for failing to investigate or present independently mitigating background evidence, on remand, the District Court can review this aspect of Lewis's claim under a de novo standard.

### IV.

For the reasons stated above, we will affirm the District Court's denial of relief as to Lewis's conviction, we will vacate its grant of relief as to Lewis's sentence, and we will remand for an evidentiary hearing consistent with this opinion.